1997 OK 127

John A. BROCK, George Kaiser, David Rainbolt, Christine F. Fletcher, Bob Howell, Citizens Against Lawsuit Abuse, Inc., Petitioners,

v.

The Honorable Donald D. THOMPSON, Judge of the District Court of Creek County, Twenty–Fourth Judicial District, Respondent,

and

Jessie Huff Durham, an individual, and Beau Williams, an individual, Real Parties in Interest.

No. 88912.

Supreme Court of Oklahoma.

Oct. 14, 1997.

James L. Kincaid, Brad R. Carson, Crowe & Dunlevy; and Frederick Dorwart and Michael J. Medina, Tulsa, for Petitioners.

W.C. Sellers, W.C. "Bill" Sellers, Inc. and W.C. Sellers, Jr., Bill Sellers, Sapulpa, for Real Parties in Interest.

OPALA, Justice.

¶1 The dispositive issue tendered by this original proceeding for a writ of prohibition is whether the district court action against the petitioners, now pending before the respondent judge, is dismissible for want of actionable quality. We hold that (a) when measured by the applicable *Conley v. Gibson*[1] standard, the plaintiffs (co-respondents herein) can muster no set of facts in support of their quest for relief against the petitioners under any legal theory and (b) the writ should issue to arrest further proceedings against the petitioners in the action below.

## I

## THE ANATOMY

¶2 This court's original cognizance is invoked to prohibit further proceedings in an action by two lawyers, Jessie Huff Durham and Beau Williams [respondents or plaintiffs], against Citizens Against Lawsuit Abuse, Inc. [CALA] and five of its leaders [collectively called CALA, petitioners or de-

fendants]. The lawsuit is also pressed against World Publishing Company, the Gaylord Entertainment Company d/b/a The Oklahoma Publishing Co., and The Oklahoma Publishing Company, *entities who are not parties to this original proceeding.* Plaintiffs allege in their second amended petition below that (a) the defendants joined a conspiracy to undermine the democratic process and to injure the plaintiff "trial lawyers"[2] by publishing "false, deceptive, fraudulent, and defamatory statements" relating to the plaintiffs, their profession and to the judicial branch of government, (b) the statements were disseminated with actual malice and with knowledge of their falsity or in reckless disregard of the truth of the statements, (c) the defendants' conduct has injured their reputations as well as their business property interest in their profession, and (d) the defendants' actions were intentionally inflicted, which caused them extreme emotional distress. The plaintiffs attached to their first amended petition below a copy of CALA's allegedly offending communication, a November 14, 1994 letter[3] written on its letterhead which (a) *states* that CALA was formed to change the "Constitution in a manner which will materially reduce the number of frivolous lawsuits", (b) *explains* that CALA's goal

1. 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

2. The plaintiffs below use the term "trial lawyer" *not* to designate a forensic practitioner but to describe one who advocates the rights of *tort claimants*.

3. CALA's letter states in pertinent part:

"November 14, 1994
Gentlemen:
*Frivolous lawsuits result in unnecessary litigation costs or the extortion of unjustified settlements.* The impact on the standard of living and quality of life of Oklahoma citizens is enormous. Economic growth is stunted by increased costs of doing business and suppressed innovation, restricting job opportunities and wages. Our local governments and school systems have been robbed of precious resources that should be allocated to building infrastructure and educating our children. Directly and indirectly all productive people suffer from the abuse of our civil justice system.

For years concerned citizens and associations have made a concerted effort to address these problems through legislation. The results have been dismal. The Trial Lawyers Association has typically prevented tort reform bills from even being heard in committee: hardly democracy at work. A near majority of members of Oklahoma's State Senate are themselves attorneys. Years of such oppression as well as recent discussions with legislative and civil leaders make it clear there will be no relief from the state legislature.

Citizens Against Lawsuit Abuse is being organized to change our Constitution in a manner which will materially reduce the number of frivolous lawsuits and make our courts more equitable. Our goal ... pass the two initiative petitions summarized below. The result ... heightened productivity and product development through a reduction in the legal bureaucracy. The business development climate in Oklahoma will be enhanced (especially relative to Texas, our notoriously litigious neighbor) and more job opportunities will result.

Citizens Against Lawsuit Abuse has selected these two initiatives because we believe they are: 1) understood by the general public; 2) popular amongst survey respondents; and 3) a broad impact. *Initiative number one is de-*

is to secure the passage of two initiative measures—one to limit the recovery of punitive damages and the other to limit the contingency fee rate a lawyer may charge, and (c) *solicits* new members as well as financial contributions for its initiative petition drive. Plaintiffs also attached to the first amended petition copies of five articles published in the Tulsa World and The Daily Oklahoman about CALA's efforts to bring about "tort reform" through the initiative process. *Some* of the defendants below brought this proceeding *after* unsuccessfully pressing at nisi prius for dismissal of the second amended petition.

> *signed to give innocent defendants greater access to the courts by reducing the extortionistic value of large punitive damage requests which are unrelated to the alleged actual damages.* The second creates a minimum quality of lawsuit that makes economic sense to be filed by limiting the fees an attorney can charge on a contingency basis.
> Initiative Petition No. 1—Punitive Damages (summary only)
> Limitation on Recovery of Punitive Damages. Punitive damages will not be awarded unless the jury is persuaded by clear and convincing evidence that the defendant: (1) acted with gross negligence or reckless disregard for the rights of the plaintiff, or (2) acted intentionally with malice toward the plaintiff.
> The judge will determine the amount of the punitive damages. If the defendant acted with gross negligence or reckless disregard for the plaintiff, but not intentionally and maliciously, the judge may award punitive damages in an amount not to exceed the actual damages suffered by the plaintiff or $250,000, whichever is more. If the defendant acted intentionally with malice toward the plaintiff, the judge may award punitive damages in an amount not to exceed twice the actual damages or $500,000, whichever is more.
> Initiative Petition No. 2—Contingent Fees— Limitation on Amount (summary only)
> It shall be unlawful for contingent attorneys fees of a client's cause of action to exceed:
> (A) 33% of the first $100,000.
> (B) 20% of the next $900,000. and
> (C) 10% of any sum over $1,000,000
> of the net amount (after direct costs) of any judgment as may be recovered or any compromise or settlement as may be made.
> Our statewide polling indicates that 77% of the voters would vote for a cap on punitive damages (with 6% undecided) and 88% would vote for a cap on attorneys contingent fees (with [unintelligible] % undecided). These are the most popular of the seven issues considered.

¶ 3 Although none of the attachments was affixed to the second amended petition below, these instruments were made part of the materials tendered here for our consideration by CALA and are *specifically referenced by the plaintiffs* in their response brief. The parties are hence deemed to have adopted these materials as fit for our analysis in entertaining this cause.[4]

## II

### RELIEF SOUGHT IN THIS COURT

¶ 4 In this original proceeding the petitioners seek dismissal of the district court

> We want your organization to join the effort by becoming a member of our steering committee. As you know, challenging the trial lawyers and taking our message to the people will be an expensive process. As you can see in the attached budget draft, we estimate it will cost approximately $600,000 to secure incontrovertible petitions, complete the legal drafting and defend the challenges that are certain to come. Thereafter, a media campaign could cost an additional $1.5 to $2.5 million. Consequently, we will eventually plan on soliciting your membership for financial assistance once our 501–C–4 is formed.
> Attached is a very general time frame we wish to pursue. Obviously, decisions on the final language of the initiatives, promotional material, media content and infinite other strategic details will be taken up by the steering committee and the respective experts they hire. However, we need a "leap of faith" to some extent at this point in time as we form the nucleus of our group. Oklahoma needs to be responsive to its citizens, not to lawyers. The time for change is now!" (Emphasis supplied.)

4. By their joint use of the materials attached to the first amended petition, the parties to this original action recognize that the physical attachments to the first petition (below) are an integral part of the pleadings by which the action below is sought to be prosecuted. The adoption of the materials by their joint use in argument before us serves as the parties' recognition that they are appropriate for our scrutiny under the same principle as that which allows admissions made in the briefs to be considered as supplementing and curing an otherwise deficient appellate record. *See in this connection Reeves v. Agee*, 1989 OK 25, 769 P.2d 745, 753; *Womack v. City of Oklahoma City*, 1986 OK 14, 726 P.2d 1178, 1181; *Timmons v. Royal Globe Ins. Co.*, 1985 OK 76, 713 P.2d 589, 592; *Norris v. Norris*, 1984 OK 85, 695 P.2d 506, 507; *Greenwood v. Lyles & Buckner, Inc.*, Okl., 329 P.2d 1063, 1067 (1958); *Ramer v. State*, Okl., 302 P.2d 139, 140 (1956).

action against them because of its chilling effect on their fundamental-law liberties that are at stake in the trial court process—*i.e.*, their initiative-related legislative activities, their freedom of political speech and their right to petition the government for a change in the law. The plaintiffs counter that prohibition is not an appropriate remedy.

¶ 5 A prerogative writ that may be granted in the exercise of this court's supervisory control over inferior courts,[5] prohibition will lie to arrest unauthorized or excessive use of judicial force.[6] While erroneous denial of a motion to dismiss is not usually an error for which prohibition will issue, original cognizance will be taken to *prohibit the use of unauthorized or excessive judicial force in entertaining nonactionable claims* where, as here, *valued fundamental-law rights are clearly implicated and their immediate protection from encroachment appears necessary.*[7]

### ¶ 6 The Availability of the Prerogative Writ Sought Herein Must Be Assayed by the Conley v. Gibson Standard[8]

¶ 7 A motion to dismiss for failure to state a cause of action will not be sustained unless it should appear *without doubt* that the plaintiff can prove no set of facts in support of the claim for relief.[9] We hold that, for the reasons to be explained in Parts IV and VI *infra*, no relief *may be available* on the claim sought to be prosecuted against CALA. Because the respondents' claim *against CALA* lacks actionable quality, it cannot withstand the petitioners' quest for the action's dismissal.

## III

### THE PARTIES' ARGUMENTS

¶ 8 CALA argues the state and federal *constitutional right to petition* the government for redress of grievances absolutely protects from civil liability any communications intended to influence government action.[10] All activities that relate to the initiative process, CALA urges, are constitutionally protected as process of petitioning the government. CALA's position rests on two U.S. Supreme Court pronouncements—*Eastern Railroad Presidents' Conference v. Noerr*

---

**5.** Art. 7, § 4, Okl. Const.; *Marsh v. District Court In and For Muskogee*, Okl., 579 P.2d 832, 834 (1978); *Rey v. Means, In and For Tulsa Cty.*, Okl., 575 P.2d 116, 118 (1978).

**6.** See *Oklahoma Tax Com'n v. Ricks*, 1994 OK 115, 885 P.2d 1336, 1337; *Lee v. Hester*, 1982 OK 30, 642 P.2d 243, 246; *Moses v. Hoebel*, 1982 OK 26, 646 P.2d 601, 603–04; *State v. Evans*, Okl., 319 P.2d 1112, 1116 (1957).

**7.** *Sabouri v. Hunter*, Okl., 596 P.2d 891, 892–93 (1979) (prohibition was granted to guard against the chilling effect of the petitioner's invocation of his Fifth Amendment privilege against self incrimination). Prohibition is appropriate in public interest cases. See *Davis v. Thompson*, 1986 OK 38, 721 P.2d 789, 790; *State ex rel. York v. Turpen*, 1984 OK 26, 681 P.2d 763, 764–65; *Draper v. State*, Okl., 621 P.2d 1142, 1147 (1980); *Powell v. Seay*, Okl., 553 P.2d 161, 165 (1976); *Wiseman v. Boren*, Okl., 545 P.2d 753, 756–57 (1976).

**8.** *Supra* note 1, 355 U.S. at 45–46, 78 S.Ct. at 102.

**9.** The terms of 12 O.S.1991 § 2012(B) provide in pertinent part:

"Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:

\*　　\*　　\*　　\*　　\*　　\*

6. *Failure to state a claim upon which relief can be granted;* ..." (Emphasis added.)

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley, supra* note 1, 355 U.S. at 45–46, 78 S.Ct. at 102; *Atchison, Topeka and Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 568 n. 15, 107 S.Ct. 1410, 1417 n. 15, 94 L.Ed.2d 563 (1987); *Groce v. Foster*, 1994 OK 88, 880 P.2d 902, 906; *Dyke v. Saint Francis Hospital, Inc.*, 1993 OK 114, 861 P.2d 295, 298–299; *Frazier v. Bryan Memorial Hosp. Authority*, 1989 OK 73, 775 P.2d 281, 289. *See also* Committee Comment to 12 O.S.1991 § 2012(B), which observes that § 2012(B) is virtually the same as Rule 12(b), Federal Rules of Civil Procedure [Fed.R.Civ.P.].

**10.** For the pertinent provisions of the state and federal *petition-for-redress-of-grievances clauses*, see *infra* note 37.

*Motor Freight, Inc.*[11] and *United Mine Workers v. Pennington.*[12] This jurisprudence—commonly referred to as the *Noerr–Pennington* doctrine—holds that mere attempts to influence the enforcement or passage of legislation are not actionable under the Sherman Act,[13] even if the motive for the effort may be deemed anticompetitive.[14] Although the doctrine had its birth in the context of antitrust litigation, CALA urges, it has been extended to several direct petitioning activities—such as those of accessing the courts, lobbying legislators and pressing the initiative process[15]—as well as to conduct designed to influence public sentiment for the passage and enforcement of laws.[16] Because an initiative petition drive is a legislative activity, CALA argues, all communications that relate to it must be viewed as explicitly immunized from civil liability by state and federal fundamental law. According to CALA, legislative activity, which includes the initiative process, is statutorily protected from a libel action by the explicit terms of 12 O.S.1991 § 1443.1.[17] Lastly, CALA

**11.** 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

**12.** 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

**13.** 15 U.S.C. § 1.

**14.** In *Noerr, supra* note 11, the Court relied in large part on the desirability of avoiding the "important constitutional questions" that would arise if it imputed to Congress an intent to regulate activity covered by the First Amendment's guarantee of the right to petition the government for redress of grievances. *Id.* at 365 U.S. at 138, 81 S.Ct. at 530.

**15.** For direct petitioning activities, CALA directs us to *Subscription T.V. v. Southern Cal. Theatre Owners,* 576 F.2d 230 (9th Cir.1978) (initiative petitions were given the *Noerr–Pennington* doctrine's protection); *Sierra Club v. Butz,* 349 F.Supp. 934 (N.D.Cal.1972) (in Sierra Club's action to block logging operations in California, the court dismissed the lumber company's counterclaim for injunctive relief, reasoning that it would interfere with the First Amendment right to petition the government for redress of grievances); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 614 (8th Cir.1980) (the *Noerr–Pennington* doctrine was interposed to immunize a group of citizens from liability under 42 U.S.C. § 1983 for allegedly conspiring with city officials to prevent the construction of a building); *Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1343 (7th Cir.1977) (the court held that complaints to the government are privileged from suit under 42 U.S.C. § 1985(1)); *Reichenberger v. Pritchard,* 660 F.2d 280, 288 (7th Cir.1981) (the court states, in dicta, that an individual's right to petition the government *is absolutely privileged* from attack under the Civil Rights Act); *Brownsville Golden Age Nursing Home, Inc. v. Wells,* 839 F.2d 155, 160 (3rd Cir.1988) (no liability attaches to defendants' attempt to bring a nursing home's noncompliance with applicable regulations to the attention of appropriate authorities); *Weiss v. Willow Tree Civic Association,* 467 F.Supp. 803, 816–18 (S.D.N.Y.1979) (the lobbying of town officials held immune from suit under 42 U.S.C.

§ 1983); *Aknin v. Phillips,* 404 F.Supp. 1150, 1153 (S.D.N.Y.1975) (an individual's act of petitioning city officials to enforce noise ordinances deemed privileged from a 42 U.S.C. § 1983 action); *Sawmill Products, Inc. v. Town of Cicero,* 477 F.Supp. 636, 642 (N.D.Ill.1979) (an individual's protests to the town against the presence of a sawmill held immune from suit under 42 U.S.C. § 1983); *Anchorage Joint Venture v. Anchorage Condominium Association,* 670 P.2d 1249, 1251 (Colo.App.1983); *Bledsoe v. Watson,* 30 Cal. App.3d 105, 106 Cal.Rptr. 197, 200 (1973).

**16.** For this notion CALA directs us to *State of Missouri v. National Organization for Women [NOW],* 620 F.2d 1301, 1317 (8th Cir.1980), *cert. denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980) (NOW's boycott campaign against states refusing to ratify the Equal Rights Amendment immune from tort liability); *Mark Aero, Inc. v. Trans World Airlines, Inc.,* 580 F.2d 288, 297 (8th Cir.1978) (statements made in a publicity campaign, even if false and misleading, are protected by the First Amendment's right-to-petition clause); *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d 1076, 1083 (9th Cir. 1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977) (the right to associate and to petition an administrative agency of the government to take official action in the exercise of its powers is guaranteed by the First Amendment).

**17.** The pertinent terms of 12 O.S.1991 § 1443.1 are:

"A. A privileged publication or communication is one made:

First. In any legislative ... proceeding ..."
We do not answer the precise claim to privilege pressed under this section. As petitioners are given today ample protection from civil liability under state constitutional rubrics, we need not decide whether petitioners would qualify as lawmakers for the purpose of invoking the privilege under § 1443.1, *supra,* or the fundamental law's legislative immunity from civil liability under Art.

submits that venue in Creek County was mislaid.[18]

¶ 9 The respondents *counter* that CALA's publicity campaign, allegedly for an initiative petition drive, was in fact a *sham* that sought to disguise its sole purpose of maligning the plaintiff trial lawyers and of undermining Oklahoma's democratic processes. According to respondents, the *Noerr–Pennington* doctrine does not shield from civil liability those activities which are a subterfuge for accomplishing an unlawful purpose. The plaintiffs urge that the defendants *conspired to use unlawful means to bring about a change in the fundamental law of the state*, which actions amount to intentional infliction of emotional distress and injury to their reputations as well as to their property interest in the practiced profession.

## IV

### ¶ 10 THE GOVERNING STATE CONSTITUTIONAL PRINCIPLES

#### A.

### ¶ 11 The Political Process of Lawmaking by Initiative

¶ 12 The Oklahoma system of constitutional democracy authorizes the electorate to legislate directly by initiating and passing measures that may change the State's constitution as well as her statutes.[19] Article 5 of Oklahoma's fundamental law reserves in the people the right of the initiative (popular law-making)[20] and of the referendum (the enacted law's popular disapproval).[21] The ninety-day signature-collecting process is triggered by the pre-circulation *filing of the initiative petition* with the Secretary of State.[22] By the end of the prescribed ninety-day period, the proponents must *submit, by post-circulation filing, the signed pamphlets of the petition.*[23] Early Oklahoma jurisprudence teaches that when exercising their right to propose laws for popular enactment, the people are deemed to be members of the "largest legislative body in the state."[24] The

5, § 22, Okl. Const., *infra* note 26. *See infra* Part IV.

**18.** Today's prohibition makes this issue no longer necessary to reach.

**19.** The constitutional provisions governing the initiative and referendum are Art. 5, §§ 1–8, Okl. Const.

**20.** The terms of Art. 5, § 1, Okl. Const., are:

"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but *the people reserve to themselves the power to propose laws and amendments* to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature." (Emphasis added.)

Under the initiative rubric of Art. 5, § 1, Okl. Const., only two types of measures can qualify: (a) those that propose changes in state statutory law and (b) those that propose amendments to the State's constitution. Both must be capable of taking effect as law. *In re Initiative Petition No. 364*, 1996 OK 129, 930 P.2d 186, 193–95.

**21.** Art. 5, § 1, Okl. Const., *supra* note 20. A referendum petition, on the other hand, is designed to call an election for the purpose of preventing a legislatively passed enactment from

**22.** Once proponents of an initiative measure have drafted a petition for circulation, they must file its text with the Secretary of State. The proponents have ninety days from the date of that filing to circulate the petition to secure the necessary number of signatures. 34 O.S.Supp. 1992 § 8(A). When an initiative petition proposes a statute, the proponents must collect signatures equal to eight percent of the votes cast in the last general election. If the petition proposes an amendment to the constitution, this requirement increases to fifteen percent. Art. 5, § 2, Okl. Const. For a discussion of the initiative process in Oklahoma, see M. Sean Radcliff, Comment, *Pre–Election Judicial Review of Initiative Petitions: An Unreasonable Limitation On Political Speech*, 30 Tulsa L.J. 425 (1994).

**23.** 34 O.S.Supp.1992 § 8(A). The Secretary of State (a) *verifies* that the information required by statute is provided [34 O.S.Supp.1992 § 6], (b) *makes a physical count* of the number of signatures [§ 6.1(A)] and then (c) *publishes* the results of the count, triggering a ten-day time period during which protest to the petition or objections to the count may be filed [§ 8(C)(2)].

**24.** *In re Initiative Petition No. 23, State Question No. 38*, 35 Okl. 49, 127 P. 862, 866 (*1912*). There the court observes that:

"* * * [t]he presumption is that petitions which are circulated, signed, and filed are val-

process of changing statutory law or the State's constitution through the initiative route is a form of sanctioned popular lawmaking. *Lawmaking is a classical form of political process.* The State's initiative and referendum, which is without a counterpart in the political institutions of the federal government, has neither been explicitly sanctioned nor condemned as violative of the republican form of government.[25]

**B.**

## ¶ 13 *Legislative Immunity*

¶ 14 The Speech or Debate Clause of the Oklahoma Constitution, Art. 5, § 22,[26] *absolutely protects* legislators from suit calling for judicial inquiry into their performance "within the sphere of legitimate legislative activity." [27] Legislators may not be haled into court, either to account for acts that occurred in the course of legislative process or for judicial inquiry into their motivation for those acts.[28] The legislative privilege has

---

*petitions, and the others who sign them, are acting in the capacity of legislators.* They are *members of the largest legislative body in the state,* and, where so acting, do so in a public or at least a quasi public capacity, and when so acting the law presumes the validity and legality of their acts, and even though it should be claimed that they were acting simply in a private capacity, until overcome by proof, their acts, involving the performance of ministerial or administrative duties, such as those performed in the circulation and signing of these petitions, are presumed to be legal and not fraudulent." (Emphasis supplied.)

**25.** In *Pacific States Tel. & Tel. Co. v. Oregon,* 223 U.S. 118, 133, 32 S.Ct. 224, 228, 56 L.Ed. 377 (1912), the Court laid to rest all challenges, under the guarantee clause, to the constitutional validity of initiative and referendum. The Court refused to find the initiative *"unrepublican,"* holding that the political branches have the exclusive task of monitoring the guarantee clause and that the courts could not enforce it. The initiative process is not guaranteed by the U.S. Constitution *(Taxpayers United for Assessment Cuts v. Austin,* 994 F.2d 291, 295 (6th Cir.1993)), but once a state confers upon its citizens the opportunity to participate in the initiative process, it may not limit that state-created right in contravention of federal fundamental law. *Meyer v. Grant,* 486 U.S. 414, 422–424, 108 S.Ct. 1886, 1892–93, 100 L.Ed.2d 425 (1988) *(the right to circulate an initiative petition is "core political speech"* ).

**26.** The terms of Art. 5, § 22, Okl. Const., are:

"*Senators and Representatives shall,* except for treason, felony, or breach of the peace, *be privileged from arrest* during the session of the Legislature, and in going to and returning from the same, and, *for any speech or debate in either House, shall not be questioned in any other place.*" (Emphasis added.)

Oklahoma's Speech or Debate Clause, *supra,* was taken directly from the United States Constitution's Art. I, § 6, cl. 1, which provides that senators and representatives "for any Speech or Debate in either House ... *shall not be questioned in any other Place.*" (Emphasis added.) The origin of the Clause is ascribed to the practice of

the British Parliament. *Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377, 391 (1881), quoting from Story, Commentaries on the Constitution § 866. *See also United States v. Johnson,* 383 U.S. 169, 177, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966). A 1512 suit against a member of the House of Commons prompted Parliament to pass the .first special immunity bill. *See* Strode's Case, discussed in *Johnson, supra* at 383 U.S. at 182 n. 13, 86 S.Ct. at 756 n. 13. The English Bill of Rights of 1689, which included a provision "[t]hat the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament," appears to be the source of the privilege found in our 1776 Articles of Confederation. The latter, with but a slight modification, was carried into the U.S. Constitution as its Speech or Debate Clause. See *Kilbourn, supra,* 103 U.S. at 203, 26 L.Ed. at 391; *Johnson, supra,* 383 U.S. at 177–178, 86 S.Ct. at 754. Oklahoma's Speech or Debate Clause, Art. 5, § 22, Okl. Const., *supra,* provides at least as much protection as the immunity granted by the comparable provisions of the Federal Constitution.

**27.** *Davis v. Passman,* 442 U.S. 228, 235–36 n. 11, 99 S.Ct. 2264, 2272 n. 11, 60 L.Ed.2d 846 (1979), quoting from *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 501, 95 S.Ct. 1813, 1820, 44 L.Ed.2d 324 (1975).

**28.** The Speech or Debate Clause *not only* shields legislators from the consequences of litigation, but *also protects them from the burden of defending themselves in court. U.S. v. Gillock,* 445 U.S. 360, 366–367, 100 S.Ct. 1185, 1190, 63 L.Ed.2d 454 (1980); *Powell v. McCormack,* 395 U.S. 486, 502–503, 89 S.Ct. 1944, 1953–54, 23 L.Ed.2d 491 (1969); *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427–28, 18 L.Ed.2d 577 (1967). The fundamental purpose of the clause is to ensure that the legislative function may be performed free from a threat of litigation. *Eastland, supra* note 27, 421 U.S. at 502, 95 S.Ct. at 1820–21; *Gravel v. United States,* 408 U.S. 606, 618, 92 S.Ct. 2614, 2623, 33 L.Ed.2d 583 (1972). The U.S. Supreme Court's jurisprudence interprets the federal Speech or Debate Clause broadly to effectuate its purposes, teaching that any acts by

never been limited to words spoken in debate.[29] The constitution's immunity shields all enactment-related conduct, whether a legislator[30] be sued (1) personally, (2) in an official capacity, or (3) as the Legislature's leader.[31] The line separating protected from unprotected legislative activity lies in the distinction between "purely legislative activities" and those that are nongermane "political matters".[32]

## C.

### ¶ 15 Protected Political Speech

¶ 16 Restraint upon free speech is prohibited by the terms of Art. 2, § 22, Okl. Const.[33] The State's free-speech guarantee protects the public by allowing issues to be freely and vigorously discussed.[34] *Advocacy for or against a proposed law is the purest form of political speech.*[35] A state cannot

members of Congress or their aides within the performance of their legislative functions *are beyond judicial scrutiny* (*Gravel, supra*, 408 U.S. at 616–27, 92 S.Ct. at 2622–28).

**29.** *Kilbourn, supra* note 26, 103 U.S. at 204, 26 L.Ed. at 391–392. In *U.S. v. Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), the Court notes that in every case that has come before it, "the Speech or Debate Clause has been limited to an act which was clearly a part of the legislative process—the due functioning of the process," citing *"Kilbourn ... [supra ]* (voting for a resolution); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (harassment of witness by state legislator during a legislative hearing is not within the protection of the Speech or Debate Clause); *United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966) (making a speech on House floor); *Dombrowski ... [supra* note 28] (issuing subpoena for records to be presented to a committee hearing); *Powell ... [supra* note 28] (voting for a. resolution)." *Id.*, 408 U.S. at 515–16, 92 S.Ct. at 2539 n. 10. In the same footnote the Court observes that an early Massachusetts case (*Coffin v. Coffin*, 4 Mass. 1 (1808)) holds "the state equivalent of the Speech or Debate Clause ... [is] inapplicable to a legislator who was acting outside of his official duties." *See also Hutchinson v. Proxmire*, 443 U.S. 111, 133, 99 S.Ct. 2675, 2687, 61 L.Ed.2d 411 (1979) (in a libel suit against a United States senator the court held that the senator's press releases and newsletters were not protected by the Speech or Debate Clause).

**30.** *See, e.g., McCracken v. City of Lawton*, 1982 OK 63, 648 P.2d 18, 20, where this court held a city's statutory immunity protected it from civil liability for damages from harm dealt a landowner by its legislative action.

**31.** *Kilbourn, supra* note 26, 103 U.S. at 204, 26 L.Ed. at 391–392.

**32.** *See Brewster, supra* note 29, 408 U.S. at 512, 92 S.Ct. at 2537; accord, Tribe, American Constitutional Law (2d ed. 1988) § 5–18, at 371.

**33.** The terms of Art. 2, § 22, Okl. Const., are:
"Every person may *freely speak, write,* or *publish* his sentiments on all subjects, being responsible for the abuse of that right; and no

law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions for libel, the truth of the matter alleged to be libelous may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous be true, and was written or published with good motives and for justifiable ends, the party shall be acquitted." (Emphasis supplied.)
Oklahoma state constitution's protection of free speech is more broadly worded than the First Amendment's restriction on governmental interference with speech. The latter states in pertinent part that "Congress shall make no law ... abridging the freedom of speech, ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**34.** The free-speech guarantee gives each citizen an equal right to self-expression and to participation in self-government. *See, e.g., Carey v. Brown*, 447 U.S. 455, 459–463, 100 S.Ct. 2286, 2289–2291, 65 L.Ed.2d 263 (1980); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787–88, 29 L.Ed.2d 284 (1971); *Whitney v. California*, 274 U.S. 357, 375–377, 47 S.Ct. 641, 648–649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). It also protects the rights of listeners to "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945). "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 928, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982).

**35.** In *Meyer, supra* note 25, 486 U.S. at 422, 108 S.Ct. at 1892, the Court held that the circulation of initiative petitions and the concomitant exchange of political ideas constitute "core political speech." A state, though generally free to regulate its own initiative process, is limited in the extent to which it may burden the communi-

burden the free exchange of ideas about the objective of an initiative proposal.[36]

## D.

### ¶ 17 The Right to Petition for Redress of Grievances

■ ¶ 18 The right of the people to petition the government for redress of griev-

ances is safeguarded in Art. 2, § 3 of the state constitution.[37] Legitimate attempts to influence government action are protected by this fundamental guarantee.[38] The clear import of the right-to-petition clause is to immunize from exposure to legal action persons who attempt to induce the passage or enforcement of law or to solicit governmental action, even though the result of such activities may indirectly cause injury to others.[39]

cation of ideas about the political change at issue in an initiative proposal that occurs during petition circulation. *Id.* 486 U.S. at 423–27, 108 S.Ct. at 1893–94. *See First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 776–777, 98 S.Ct. 1407, 1415–1416, 55 L.Ed.2d 707 (1978) (speech on an income-tax referendum "is at the heart of the First Amendment's protection").

**36.** *Meyer supra* note 25, 486 U.S. at 422, 108 S.Ct. at 1892, teaches that a state has no "power to limit discussion of political issues raised in initiative petitions." The First Amendment affords the broadest protection to political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957); *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). The discussion of public issues is integral to the operation of the system of government established by our Constitution. *Speech on public issues occupies the "highest rung of the hierarchy of First Amendment values," and is entitled to special protection. N.A.A.C.P., supra* note 34, 458 U.S. at 913, 102 S.Ct. at 3425 (emphasis supplied); *Carey, supra* note 34, 447 U.S. at 467, 100 S.Ct. at 2293; *Dun & Bradstreet, Inc., v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758–59, 105 S.Ct. 2939, 2944–45, 86 L.Ed.2d 593 (1985) (speech on matters of public concern is at the heart of the First Amendment's protection); *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government"). *Although First Amendment protections are not confined to "the exposition of ideas,"* (*Winters v. New York,* 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948)), *"there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs ..." Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966).

**37.** The provisions of Art. 2, § 3, Okl. Const., are:
The *people have the right* peaceably to assemble for their own good, and *to apply* to those invested with the powers of government *for redress of grievances by petition,* address, or remonstrance. (Emphasis added.)

Oklahoma's right-to-petition clause, *supra,* is similar to, and was no doubt taken from, Art. I (cl. 6) of the U.S. Constitution, which provides that "Congress shall make no law ... abridging ... the right of the people ... to *petition the government for a redress of grievances."* (Emphasis supplied.) Because there is a paucity of Oklahoma jurisprudence construing the state petition-for-grievance clause, we look to analogous federal case law only for guidance. As the Court notes in *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945), this is a basic freedom in a participatory government, closely related to freedom of speech; together these are the "indispensable democratic freedoms" that cannot be abridged if a government is to continue to reflect the desires of the people.

**38.** The right to petition for redress of grievances is historically the right to complain about and to the government. *Wolfgram v. Wells Fargo Bank,* 53 Cal.App.4th 43, 61 Cal.Rptr.2d 694, 699–701 (1997). The right of petition first appeared in the Magna Carta, Chapter 61, and was incorporated in the English Bill of Rights of 1689. For an in-depth discussion of the origins and historical appeals to the protection of the petition clause, *see* Stephen A. Higginson, *A Short History of the Right to Petition Government for the Redress of Grievances,* 96 Yale L.J. 142 (1986); Anita Hodgkiss, *Petitioning and the Empowerment Theory of Practice,* 96 Yale L.J. 569 (1987); Norman B. Smith, *'Shall Make No Law Abridging ...': An Analysis of the Neglected, but Nearly Absolute, Right of Petition,* 54 U.Cin.L.Rev. 1153, 1166–75 (1986); Note, *A Petition Clause Analysis of Suits Against the Government: Implications for Rule 11 Sanctions,* 106 Harv.L.Rev. 1111, 1113 (1993).

**39.** Although the U.S. Court of Appeals for the 11th Circuit appears to have approved in dicta a federal district court's statement that initiative petitions not only "represent the exercise of individuals of their fundamental rights to express themselves freely" but also *"to petition the government for redress of grievances,"* we need not, *and do not today, address* the issue whether *legislative initiative* activities also implicate the state petition-for-redress-of-grievances clause. *See Delgado v. Smith,* 861 F.2d 1489, 1497–98 (11th Cir.1988), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989).

## E.

### *Analysis of the Facts*

¶ 19 At the very outset our task here is to determine whether the November 14, 1994 letter—the sole publication complained of in the plaintiffs' first amended petition below (as well as in their brief in this original cause) which is attributable to CALA—is protected by the State's fundamental law.

■ ¶ 20 Promoters of an initiative petition drive at its circulation stage clearly act as political advocates for lawmaking through the initiative process. Their activities *stand protected by legislative immunity* through Oklahoma jurisprudence which teaches that (when circulating and signing initiative or referendum petitions) the people act in their legislative capacity.[40] The promoters' circulation-related activities as well as their advocacy of a petition by advertisements, distribution of leaflets or *soap-box* utterances urging the people to sign the petition and by similar conduct all are to be viewed as the functional equivalent of a floor speech or committee argument. The constitutional legislative privilege from liability extends to all germane activities of the initiative process.[41]

■ ¶ 21 CALA's November 14 letter was disseminated at the promotional *stage* that antedates a petition's pre-circulation filing. It occurred during a campaign to "test the waters" for public support of an initiative measure that would change the law and to raise contributions toward that endeavor. We need not decide here with precision *when*

an initiative promoter becomes a lawmaker eligible for protection of the legislative privilege.[42] Suffice it to say that in this case, assuming the promoters had not yet become legislators in the privilege sense, they were nonetheless protected from civil liability by state fundamental-law guarantees that safeguard direct lawmaking by the people, the people's access to government for pressing a political change and last, but not least, the freedom of expression that constitutes "political speech."

■ ¶ 22 Promoting *legal change* by any form of publicity in advance of the petition's pre-circulation filing is critical to the initiative process because the promoters must be able to ventilate the issues before those who are expected to join in the effort by signing the petition. Advocacy that is an essential step to launching an initiative drive is part of *the process for petitioning the electorate* and for *ultimately impacting the government.* If there is a *rational connection* between the communication or utterance complained of as defamatory and the author's quest for a political change, the communication should be viewed as protected *both as political speech* and a *means of securing a change in the government's conduct of its business.* While the so-called *offending conduct* may be injurious or offensive to plaintiffs' interests, it nonetheless constitutes protected political speech which must be more jealously and intensely guarded than any other form of permissible expression.[43] "[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."[44] *The*

---

40. *Initiative Petition No. 23, supra* note 24 at 866.

41. *Id.*

42. For the pertinent provisions of the state constitution's speech or debate clause (Art. 5, § 22, Okl. Const.), see *supra* note 26.

43. As Justice Brandeis said in his concurring opinion in *Whitney, supra* note 34, 274 U.S. at 375, 47 S.Ct. at 648, "[t]hose who won our independence believed that * * * the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government." This, we might add, is a fundamental principle of the Oklahoma government as well.

44. *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1366, 22 L.Ed.2d 572 (1969). " '[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.' " *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55–56, 108 S.Ct. 876, 881–882, 99 L.Ed.2d 41 (1988) (quoting *FCC v. Pacifica Foundation,* 438 U.S. 726, 745–46, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073 (1978)); *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 65, 72, 103 S.Ct. 2875, 2879, 2883, 77 L.Ed.2d 469 (1983); *Carey v. Brown,* 447 U.S. 455, 462–463, 100 S.Ct. 2286, 2291, 65 L.Ed.2d 263 (1980); *Young v. American Mini*

*law's protection of free expression recognizes "no such thing as a false idea."*[45]

¶ 23 CALA's letter clearly advocates for a change in the law then in effect, which was said to lack adequate restraints either upon the quantum of punitive-damage awards or on the allowable rate for legal fees.[46] While we do not pass today on the outer reach of the promoters' *legislative immunity defense,* the sum of the other constitutional safeguards, viewed in conjunction, operates to render the pled conduct of CALA impervious to civil liability.

¶ 24 Under our system of government, no one can be made responsible civilly or to the government for robustly pressing political views that others oppose with equal vigor.

V

THE PLAINTIFFS' THEORIES
OF LIABILITY

A.

¶ 25 *Defamation*

¶ 26 According to the respondents' argument, the petitioners' publication (of the November 14 letter)[47] is libelous *per se* because it falsely accuses the plaintiff trial lawyers of practising extortion. This publication, respondents urge, is part of a publicity campaign to malign them as trial lawyers in an attempt to "injure their power and duty to practice law and to serve their clients." In support of their other assertion that the writing is at least libelous *per quod,* respondents argue that the petitioners' conspiracy has sought to defame "plaintiff trial lawyers" as a strategy choice foundation for undermining the democratic process in an effort to limit their delegated power and duty as trial lawyers. Moreover, respondents submit that the petitioners' conduct has wrongfully interfered with their right to pursue their profession by representing clients through free and unimpaired access to the courts, "unfettered by the unfair and unjust restrictions sought and secured by the petitioners."

▆▆▆▆ ¶ 27 Actions for libel are statutorily defined. A publication is libelous *per se* (when the defamatory impact is apparent on its face) if it "exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation...."[48] To determine whether a publication is libelous *per se,* the writing must be measured by its natural and probable effect upon the mind of the average lay reader.[49]

*Theatres, Inc.,* 427 U.S. 50, 63–65, 67–68, 96 S.Ct. 2440, 2448–2450, 2450–2451, 49 L.Ed.2d 310 (1976) (plurality opinion); *Buckley v. Valeo,* 424 U.S. 1, 16–17, 96 S.Ct. 612, 633–634, 46 L.Ed.2d 659 (1976); *Grayned v. Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2302–2303, 33 L.Ed.2d 222 (1972); *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972); *Bachellar v. Maryland,* 397 U.S. 564, 567, 90 S.Ct. 1312, 1314, 25 L.Ed.2d 570 (1970).

**45.** *Hustler, supra* note 44, 485 U.S. at 51, 108 S.Ct. at 879 (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974)).

**46.** Although CALA's chosen method for effecting the change was to be by the initiative process, its goal appears partly to have been achieved by a 1995 legislative amendment embodied in 23 O.S.Supp.1995 § 9.1. Punitive (exemplary) damages were originally governed by 23 O.S. 1971 § 9 (enacted in 1910), which authorized "damages for the sake of example" when a tort defendant "was found guilty" of "oppression, fraud, or malice." Section 9 underwent a revision in 1986 when it was replaced by 23 O.S.Supp.1986 § 9(A). The 1986 scheme required a midtrial *judicial determination,* to be effected at the conclusion of the plaintiff's case in chief, that there was sufficient evidence for the jury to consider an exemplary damages award in excess of actual damages. The 1986 text was repealed and replaced in 1995 by the provisions of 23 O.S.Supp.1995 § 9.1. For a discussion of § 9's metamorphosis, see *The YWCA of Oklahoma City v. Melson,* 1997 OK 81, 944 P.2d 304 (1997).

**47.** For the pertinent provisions of CALA's November 14, 1994 letter, see *supra* note 3.

**48.** 12 O.S.1991 § 1441.

**49.** *Fawcett Publications, Inc. v. Morris,* 377 P.2d 42, 48 (1962); *Hargrove v. Oklahoma Press Pub. Co.,* 130 Okl. 76, 265 P. 635, 636 (1928). Whether a writing is libelous depends on the scope, spirit and motive of the publication taken in its entirety. An article must be given its most natural and obvious meaning, not a strained, forced or unnatural one. *Tulsa Tribune Co. v. Kight,* 174 Okl. 359, 50 P.2d 350, 353 (1935).

Those words are deemed actionable on their face which prejudicially impugn a person's skill, knowledge, or conduct in his (or her) business.[50] A writing is actionable *per se* when the language used is susceptible of but a single meaning that is opprobrious.[51] In contrast, a publication is deemed libelous *per quod* if the words are reasonably susceptible of both a defamatory and an innocent meaning.[52] The latter form of libel requires proof by extrinsic facts to show a defamatory meaning. The issue whether a writing is libelous *per se* is a matter of law for decision by the trial court. A fact determination, if necessary to decide whether a publication is libelous *per quod,* is for the jury.[53]

¶ 28 Oklahoma jurisprudence teaches that in *group libel actions*—where the opprobrium of publication attributable to an individual plaintiff arises solely by reason of membership in the group—(a) the size of the group alone is not controlling although it is a factor to be considered, and (b) the intensity of suspicion cast upon the plaintiff is the true test in determining a plaintiff's right to maintain a personal action for group libel.[54]

■ ¶ 29 The statement in CALA's November 14, 1994 letter on which the defamation claim appears to be rested *does not target legal professionals.* Rather, it is plainly germane to the political objective of the promoters because it is designed to explain the presence of a need for the proposed legislation. Its text aims at the then legal system's tolerance for exaggerated damage claims [55]—not at the legal profession itself (or as respondents urge, a *subclass of trial lawyers*). CALA's language does not raise an inference that the abuse (through excessive damage claims) is authored by lawyer conduct. On the contrary, the text clearly identifies a need for legislation that would fashion a powerful governor on the then-perceived freedom to press for excessive punitive-damages jury verdicts. No one individual or even a small group of individuals is identified or isolated as a target for odium, criticism or for legal action. CALA's dramatic description of the need for the petition to be circulated and for the legislation to be pressed is protected political advocacy that cannot be the basis of actionable defamation. Moreover, if under the free-speech guarantee "good motives" and "justifiable ends" are a defense against criminal libel,[56] they certainly are against civil libel. Assuming a group libel action by the respondents would lie against the petitioners, the letter's text is defamatory neither of lawyers nor of trial lawyers as a subclass.

¶ 30 Based on the four corners of the petition and, applying the *Conley v. Gibson* [57] test, the respondents cannot advance against

---

**50.** *McCullough v. Cities Service Co.*, 1984 OK 1, 676 P.2d 833, 834 (1984), citing *Kee v. Armstrong, Byrd & Co.*, 75 Okl. 84, 182 P. 494 syl. 3 (1919).

**51.** *Robert K. Bell Enterprises, Inc. v. Tulsa County Fairgrounds Trust Authority*, 1985 OK 10, 695 P.2d 513, 517; *Gentry v. Wagoner County Publishing Company*, Okl., 351 P.2d 718, 720 (1960); *Lindley v. Delman*, 166 Okl. 165, 26 P.2d 751, 753 (1933). In *Fite v. Oklahoma Pub. Co.*, 146 Okl. 150, 293 P. 1073, 1075 (1930), the court notes that the term *per se* means " 'by itself; simply as such; in its own nature without reference to its relations.' " In slander and libel cases, the term is applied to words which are actionable " 'because they, of themselves, without anything more, are opprobrious.' " *Id.*, quoting *Hargrove, supra* note 49 at 636. See *also Tulsa Tribune Co., supra* note 49 at 353.

**52.** *Miskovsky v. Tulsa Tribune Co.*, 1983 OK 73, 678 P.2d 242, 247; *Akins v. Altus Newspapers, Inc.*, Okl., 609 P.2d 1263, 1267 (1977), *cert. denied* 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980). If the publication is not libelous *per*

*se,* an allegation of special damages is essential to state a cause of action. *Robert K. Bell Enterprises, supra* note 51 at 517; *Edwards v. Crane,* Okl., 292 P.2d 1034, 1036 (1956).

**53.** *Robert K. Bell Enterprises, supra* note 51 at 516; *Winters v. Morgan*, Okl., 576 P.2d 1152, 1154 (1978); *Akins, supra* note 52 at 1267. If the publication is deemed libelous *per quod*, it is for the jury to determine the *factum* of injury and damage.

**54.** *McCullough, supra* note 50 at 835–36; *Fawcett, supra* note 49 at 51–52.

**55.** For a discussion of the pre–1995 statutory regime for allowance of punitive-damages awards, see *supra* note 46.

**56.** For the pertinent provisions of Art. 2, § 22, Okl. Const., see *supra* note 33.

**57.** *Supra* note 1, 355 U.S. at 45–46, 78 S.Ct. at 102.

the petitioners a defamation claim upon which relief may be granted.

## B.

¶ *31 The Tortious Interference With Respondent's Advantageous Business Relations (Present and Prospective )*

 ¶ 32 The respondents appear to press a common-law claim for tortious interference with advantageous business relations.[58] We need not examine in detail the particular elements of this cause of action. If there is no element of unlawfulness in either the *objective* of the agreement or the *means* by which the purpose or objective is to be accomplished, there can be no actionable tort of interference with advantageous relations.[59]

 ¶ 33 A review of plaintiffs' complaints fails to disclose any allegations of "unlawful" means used by the defendants to interfere with the plaintiffs' prospective or present business relationships. Communications that fall within the state constitutional

freedom of political speech and the right to petition for redress of grievances cannot be viewed as acts of tortious interference with a lawyer's advantageous business relations. Measuring this claim by the *Conley v. Gibson* test,[60] we conclude from the four corners of the second amended petition (viewed in conjunction with the physical attachments to the first amended petition) that the respondents cannot advance a claim for tortious interference with their advantageous relations which would entitle them to relief against the petitioners on this theory.

## C.

¶ *34 The Intentional Infliction of Emotional Distress*

 ¶ 35 Oklahoma recognizes as an independent tort the intentional infliction of emotional distress.[61] The delict, also known as a tort of outrage, is governed by the narrow standards of Restatement (Second) of Torts § 46.[62] An action for intentional inflic-

---

58. Oklahoma jurisprudence teaches that one has the right to prosecute a lawful business without unlawful molestation or unjustified interference from any person, and any malicious interference with that business is an unlawful act and an actionable wrong. *Crystal Gas Co. v. Oklahoma Natural Gas. Co.*, Okl., 529 P.2d 987, 989 (1974); *Nat'l Life & Accident Ins. Co. v. Wallace*, 162 Okl. 174, 21 P.2d 492, 494 (1933); *Stebbins v. Edwards*, 101 Okl. 188, 224 P. 714, 715–16 (1924); *Schonwald v. Ragains*, 32 Okl. 223, 122 P. 203, 208 (1912). For a discussion of the difference between interference with a prospective economic advantage and with contractual or business relations, *see Overbeck v. Quaker Life Ins. Co.*, 1984 OK CIV APP 44, 757 P.2d 846, 847–48. *See in this connection Lakeshore Community Hosp., Inc. v. Perry*, 212 Mich.App. 396, 538 N.W.2d 24, 27 (1995); *Weitting v. McFeeters*, 104 Mich.App. 188, 304 N.W.2d 525, 529 (1981); *Wilkerson v. Carlo*, 101 Mich.App. 629, 300 N.W.2d 658, 659 (1981), for the elements of tortious interference with advantageous business relationships or prospective economic relations. The Restatement (Second) of Torts § 766B states that "[o]ne who *intentionally* and *improperly interferes with another's prospective contractual relation* (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continu-

ing the prospective relation." (Emphasis supplied.)

59. There is no actionable claim if the *interference is lawful* or *does not encompass any unfair or unlawful act. See, e.g., Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168, 521 N.Y.S.2d 672, 676 (1987) (intentional interference with a precontractual business relationship is actionable if effected by unlawful means or, under the theory of prima facie tort, by lawful means without justification); *Quail Ridge Assocs. v. Chemical Bank*, 162 A.D.2d 917, 919–20, 558 N.Y.S.2d 655, 658, appeal dismissed, 76 N.Y.2d 936, 563 N.Y.S.2d 64, 564 N.E.2d 674 (N.Y.App.1990); *accord BPS Clinical Laboratories v. Blue Cross and Blue Shield of Michigan*, 217 Mich.App. 687, 552 N.W.2d 919, 925 (1996) (Michigan law) (requiring unlawful means); *see also Bonelli v. Volkswagen of Am.*, 166 Mich.App. 483, 421 N.W.2d 213, 219–220 (1988) (requiring unlawful means).

60. *Supra* note 1, 355 U.S. at 45–46, 78 S.Ct. at 102.

61. *See Eddy v. Brown*, 1986 OK 3, 715 P.2d 74, 76; *Breeden v. League Services Corp.*, Okl., 575 P.2d 1374, 1377 (1978).

62. Section 46, Restatement (Second) of Torts (1977) states in pertinent part:

"46. Outrageous Conduct Causing Emotional Distress

tion of emotional distress will lie only where there is extreme and outrageous conduct coupled with severe emotional distress.[63] It is the trial court's responsibility initially to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the § 46 standards.[64] Conduct which, though unreasonable, is neither "beyond all possible bounds of decency" in the setting in which it occurred, nor is one that can be "regarded as utterly intolerable in a civilized community" falls short of having actionable quality.

¶ 36 In this case scenario the offensive activity is both *protected* and *nondefamatory*. These two characteristics, when combined, take the conduct tendered as legally harmful out of the ambit of that character of outrageousness which is required to make it actionable under the tort-of-outrage rubric.

¶ 37 Measured by the *Conley v. Gibson* standard, the respondents cannot advance against the petitioners a tort-of-outrage claim that would warrant relief.[65]

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."
>
> Comment d. to that section provides in part:
> "... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to the average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'..."

**63.** *Eddy, supra* note 61 at 76; *Breeden, supra* note 61 at 1377; *Chandler v. Denton*, 1987 OK 38, 741 P.2d 855, 867.

**64.** *Eddy, supra* note 61 at 76; *Breeden, supra* note 61 at 1377.

**65.** *Supra* note 1, 355 U.S. at 45–46, 78 S.Ct. at 102.

**66** *Jurkowski v.Crawley, 1981 OK 110, 637 P.2d 56, 62;* Barsh v. Mullins, Okl., *338 P.2d 845, 847 (1959). For other jurisdictions applying the com-*

## D.
### ¶ 38 Civil Conspiracy

¶ 39 A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means.[66] Unlike its criminal counterpart, civil conspiracy itself does not create liability. To be liable the conspirators must pursue an independently unlawful purpose or use an independently unlawful means.[67] There can be no civil conspiracy where the *act* complained of and the *means employed* are lawful.[68] Constitutionally protected speech that renders a defamation claim nonactionable also serves to defeat a claim of conspiracy where the means allegedly employed to achieve that purpose are lawful.[69]

¶ 40 The plaintiffs below urge that CALA entered into a conspiracy with other corporate entities to undermine the democratic process through a campaign to publish *false* and *defamatory* information about the plaintiff trial lawyers, their profession and the Oklahoma court system. The plaintiffs seek to vindicate the conspiracy against the defendants by employing civil process. The sole defamatory publication which plaintiffs at-

*mon-law definition of civil conspiracy, see* Admiral Ins. Co. v. Columbia Cas. Ins. Co., *194 Mich. App. 300, 486 N.W.2d 351, 358 (1992);* Chemetron Corporation v. Business Funds, Inc., *682 F.2d 1149, 1179 (5th Cir.1982) (applying Texas law);* Kent v. Kent, *431 So.2d 279, 281 (Fla.App. 1983);* Closs v. Goose Creek Consolidated Indept. Sch. Dist., *874 S.W.2d 859, 871 (Tex.App. 1994). In essence, a civil conspiracy claim enlarges the pool of potential defendants from whom a plaintiff may recover for an underlying tort.*

**67.** A conspiracy between two or more persons to injure another is not enough; an underlying unlawful act is necessary to prevail on a civil conspiracy claim. *See Stiles v. Chrysler Motors Corp.,* 89 Ohio App.3d 256, 624 N.E.2d 238, 244 (1993).

**68.** *N.A.A.C.P., supra* note 34, 458 U.S. at 928, 102 S.Ct. at 3433 (the Court held that nonviolent elements of boycott activities intended to bring about political, social and economic change are entitled to First Amendment protection); *Jurkowski, supra* note 66 at 62; *Walker v. Mills,* 182 Okl. 480, 78 P.2d 697, 700 (1938); *Shaw v. Cross,* 83 Okl. 273, 201 P. 811, 812 (1921).

**69.** *Jurkowski, supra* note 66 at 62; *Hughes v. Bizzell,* 189 Okl. 472, 117 P.2d 763, 764 (1941).

tribute to CALA is its November 14, 1994 letter.[70] The plaintiffs urge that statements in this publication accuse trial lawyers, including the respondents, of "extortion of unjustified settlement" through "frivolous lawsuits." They urge that the labeling of trial lawyers as *extortioners* disparages their standing or reputation as lawyers and members of the legal profession and injures their ability to practice law and to serve their clients. The gist of the plaintiffs' complaint is that the alleged conspiracy has *damaged their reputation qua lawyers* as well as caused *tortious interference with their business relations.*

¶ 41 As explained in Part V(A) *supra,* there is here no element of unlawfulness in the petitioners' act of combining and no unlawful elements in the objectives to be pursued. Because the arguments advanced in the November 14, 1994 letter have a direct bearing on the subject of the initiative to be launched, they constitute political advocacy in favor of a proposed legal change—a clearly protected core political speech. It is not unlawful to join with others in a common effort to bring about legal change by lawful means (via the initiative or by petitioning the government).

¶ 42 Within the meaning of the *Conley v. Gibson*[71] standard no acts can be shown to prove a ground for relief against the petitioners from a conspiracy to commit any activity other than that which is lawful and constitutionally protected. If the petitioners "conspired" to participate in activities and aims that are constitutionally protected, there is no actionable civil conspiracy. Nor is there here any element of unlawfulness in the means by which CALA's objective was to be reached. A conspiracy to carry on an activity that is lawful and constitutionally protected cannot be deemed tortious.

¶ 43 Today's holding that the plaintiffs have failed to state against the petitioners a claim upon which relief may be afforded has its basis in the free-speech and right-to-petition protections afforded by the Oklahoma Constitution. U.S. Supreme Court jurisprudence need not be dispositive in passing upon rights guaranteed by state constitutional provisions. The Oklahoma Constitution affords bona fide, separate, adequate, and independent grounds upon which today's opinion is rested.[72]

## VI

¶ 44 **FEDERAL JURISPRUDENCE**

¶ 45 We note there is some expression in the federal jurisprudence about the notion that the First Amendment's right to petition the government for relief from grievances[73] (1) is enforceable against the states through the Fourteenth Amendment,[74] (2) may pro-

**70.** For the text of the November 14, 1994 letter, see *supra* note 3.

**71.** *Supra* note 1, 355 U.S. at 45–46, 78 S.Ct. at 102.

**72.** *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983). In our declarations of state constitutional law, cited federal case law is used solely for guidance where there is a lack of state jurisprudence. For Oklahoma cases applying the *Michigan v. Long* rule, see *Matter of Adoption of J.R.M.,* 1995 OK 79, 899 P.2d 1155, 1160–61; *Messenger v. Messenger,* 1992 OK 27, 827 P.2d 865, 872; *Reynolds v. Porter,* 1988 OK 88, 760 P.2d 816, 818.

**73.** For the pertinent terms of the First Amendment's right-to-petition clause, see *supra* note 37.

**74.** [A] *FEDERAL CASELAW*—(1) *Gorman Towers, supra* note 15 at 615. There, the court held the attempts of individual property owners to prevent the construction of the plaintiffs' housing complex, which "consisted of demanding a zoning amendment and participating in the spread of false and derogatory rumors about (plaintiffs') proposed housing project," were intended to induce governmental action and, thus, were absolutely privileged activities that bar a civil rights action brought under 42 U.S.C.A. § 1983 and the First Amendment analysis of *Noerr. Id.* at 615. (2) *Sierra Club, supra* note 15 at 938. The district court applied the *Noerr–Pennington* doctrine to a common-law tortious business interference counterclaim brought by a lumber company against the Sierra Club and others, which alleged that the counterclaiming defendants had instituted administrative appeals and "other acts" with the intention of inducing the government to breach its contract to sell timber to the lumber company. The court refused to apply traditional First Amendment conditional privileges, such as actual malice, because the activity in question was intended to influence government action. [B] *STATE JURISPRUDENCE—Webb v. Fury,* 167 W.Va. 434, 448, 282 S.E.2d 28 (1981) (the *Noerr–Pennington* doctrine "bars litigation aris-

vide a defense against civil liability,[75] and (3) protects from tort liability otherwise imposable by state law.[76] The federal jurisprudence is founded on an expansion of the *Noerr–Pennington* doctrine.[77] The doctrine's status

as a legal norm having federal constitutional dimension is in doubt.[78] Equally clouded is the notion that the petition-of-grievance clause stands incorporated into the Fourteenth Amendment's due process for enforce-

ing from injuries received as a consequence of First Amendment petitioning activity, regardless of the underlying cause of action asserted by the plaintiffs"); *Wolfgram v. Wells Fargo Bank,* 53 Cal.App.4th 43, 61 Cal.Rptr.2d 694, 700 (1997) ("the First Amendment, including specifically the right to petition, is 'incorporated' against the states by virtue of the Fourteenth Amendment", citing *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 512–513, 59 S.Ct. 954, 962–63, 83 L.Ed. 1423 (1939)). [C] *LEGAL COMMENTATORS*—Akhil Reed Amar, *The Bill of Rights As A Constitution,* 100 Yale L.J. 1131, 1157 (1991) (the author states that "[l]ike their speech and press clause counterparts, the rights of petition and assembly became applicable against state governments only after the adoption of the Fourteenth Amendment"); Robert J. Kaczorowski, *The Enforcement Provisions of The Civil Rights Act of 1866: A Legislative History In Light Of Runyon v. McCrary,* 98 Yale L.J. 565, 591 (1989) (the author states that "[t]he rights secured to United States citizens by the Fourteenth Amendment were relatively minimal rights such as ... the right to petition Congress for the redress of grievances"); Edward F. Malone, *Legacy Of The Reconstruction: The Vagueness Of The Criminal Civil Rights Statutes,* 38 Univ. of Cal. of LA L.Rev 163, 177 n. 52 (1990) (citing Kaczorowski, supra, at 159–66); Douglas P. Witteman, *Procedural Due Process Under The Kansas Teacher Due Process Act: Going Through The Motions Is Not Enough [Unruh v. Unified School District No. 300,* 245 Kan. 35, 775 P.2d 171 (1989)], 29 Washburn L.J. 668, 669 n. 9 (1990) (the author states that the "rights contained in the Bill of Rights which are considered fundamental to ordered liberty are applied to the states through the fourteenth amendment due process clause under the Incorporation Doctrine ... *Bridges v. California,* 314 U.S. 252, 277 [62 S.Ct. 190, 201, 86 L.Ed. 192] (1941)) (fourteenth amendment makes first amendment right to petition applicable to states)."

**75.** *Video Intl. Prod. Inc. v. Warner-Amex Cable Communications, Inc.,* 858 F.2d 1075, 1084 (5th Cir.1988) (the *Noerr–Pennington* doctrine has been "expanded ... to protect first amendment petitioning of the government from claims brought under federal and state laws, including section 1983 and common-law tortious interference with contractual relations").

**76.** *Suburban Restoration Co. v. ACMAT Corp.,* 700 F.2d 98, 102 (2d Cir.1983) (non-sham petitioning activities immunized the defendants from alleged violations of a state statute regulating unfair trade practices and common-law claims of tortious interference with a business expectancy).

**77.** *In Noerr, supra* note 11, trucking operators and their trade association brought suit under the Sherman Act against a number of railroads. Plaintiffs claimed that a railroad-sponsored publicity campaign to create public support for anti-trucking laws was an illegal attempt to monopolize the freight industry. The railroads filed a counterclaim, charging that the truckers sought to establish a monopoly through similar political activities. Dismissing the claims, the Court held, first, that the Sherman Act did not reach political activity, and, second, that neither the anticompetitive purpose of the railroads in initiating the advertising campaign nor their deception in conducting that campaign were relevant to the antitrust analysis. Four years later, in *Pennington, supra* note 12, the Court reaffirmed these principles. There, a union and a number of large coal companies allegedly engaged in a scheme to drive smaller firms out of business by persuading the Secretary of Labor to establish a high minimum wage for employees of companies selling coal to the Tennessee Valley Authority (TVA), and by convincing the TVA to curtail spot market purchases from suppliers who were exempt from the minimum wage law. The Court applied *Noerr,* declaring only that a plaintiff harmed by the political lobbying may not recover under the Sherman Act.

**78.** According to one commentator, more than a quarter of a century after *Noerr* the outer limit of the *Noerr–Pennington* doctrine remains unsettled. Stephen Calkins, *Developments in Antitrust and The First Amendment: The Disaggregation of Noerr,* 57 Antitrust Law Journal 327, 329 (1988). The root of the uncertainty, the author states, is in the Court's failure to decide whether the doctrine is founded on constitutional principles. "The Court said that its decision was based on statutory interpretation, although it noted that an alternative interpretation 'would raise important constitutional questions.'" *Id.* at 329 (quoting *Noerr, supra* note 11, 365 U.S. at 138, 81 S.Ct. at 529–530). Similarly, another commentator states that the *Noerr* decision was strictly a matter of statutory interpretation—*a construction of the Sherman Act and not a declaration of standards by which First Amendment cases should be reviewed. Norman B. Smith, supra* note 38 at 1154. In *Noerr,* the author notes, the Court acknowledged that a holding that the Sherman Act applies to political activity "would raise important constitutional questions." The Court further observed that because the "right of petition is one of the freedoms protected by the Bill of Rights," it could not lightly impute to Congress an intent to invade these freedoms. *Id.*

ment against the states.[79] One recent federal case states that the state initiative process does not appear to implicate the sort of petitioning guaranteed by the federal petition-of-grievance clause.[80] The court explains that in the initiative process people do not seek to make their wishes "known to government representatives, but instead [press] to enact change by bypassing their representatives altogether."[81] Because the outer limit of the *Noerr–Pennington* doctrine appears unsettled and unstable federal petition-of-grievance-clause jurisprudence does not securely protect the right to political expression, we rest today's pronouncement on "adequate and effective state law."[82]

## SUMMARY

▪ 46 Prohibition will lie to arrest pending proceedings when the remedy of appeal is manifestly inadequate to protect against the chilling effect of a civil action on fundamental political freedom and the action to be prohibited lacks actionable quality. The state constitutional shield surrounding political activity *protects these petitioners from the burden of defending themselves in court for the conduct that forms the basis of* *the claim sought to be prosecuted against them.*

¶ 47 Based on the four corners of the second amended petition (with recognized materials) and applying the *Conley v. Gibson*[83] test, the respondents cannot advance against these petitioners their pressed claim below under any legal theory.

¶ 48 **ORIGINAL COGNIZANCE TAKEN; WRIT GRANTED.**

¶ 49 SUMMERS, V.C.J., HODGES, LAVENDER and OPALA, JJ., and STRUBHAR, S.J. (sitting by designation in lieu of KAUGER, C.J., who certified her recusal), concur.

ALMA WILSON, J., concurs in part and dissents in part.

SIMMS, HARGRAVE and WATT, JJ., dissent.

---

**79.** When the U.S. Supreme Court has accorded protection to conduct under the petition clause, other first amendment rights, such as the right to assemble, to associate, or to speak freely on a matter of legitimate public concern, were also implicated by the conduct in question and were the principal concerns in the Court's decision that the conduct should be protected. *See, e.g., N.A.A.C.P., supra* note 34, 458 U.S. at 907–13, 102 S.Ct. at 3422–27; *Smith v. Arkansas State Highway Employees, Local 1315,* 441 U.S. 463, 464–66, 99 S.Ct. 1826, 1827–28, 60 L.Ed.2d 360, 363 (1979); *City of Madison v. Wisconsin Employment Relations Com'n,* 429 U.S. 167, 174–75, 97 S.Ct. 421, 426, 50 L.Ed.2d 376, 384 (1976); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642, 646 (1972); *United Mine Workers, District 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222–23, 88 S.Ct. 353, 356–57, 19 L.Ed.2d 426, 430–31 (1967); *Adderley v. Florida,* 385 U.S. 39, 41–42, 87 S.Ct. 242, 243–44, 17 L.Ed.2d 149, 152 (1966); *Edwards v. South Carolina,* 372 U.S. 229, 235–38, 83 S.Ct. 680, 683–85, 9 L.Ed.2d 697, 701–03 (1963); *N.A.A.C.P. v. Button,* 371 U.S. 415, 429–30, 83 S.Ct. 328, 336, 9 L.Ed.2d 405, 415–16 (1963); *Thomas, supra* note 37, 323 U.S. at 531–32, 65 S.Ct. at 323–24.

**80.** In *Biddulph v. Mortham,* 89 F.3d 1491, 1497 (11th Cir.1996), the plaintiff acknowledged that the right to propose legislation by citizen initiative is *not* guaranteed by the U.S. Constitution but is a state-created right. The court agreed, stating "[t]his alone should indicate that the guarantee found in the Petition Clause is not implicated by the regulation of a citizen initiative." The court observed that the scholarship on the issue supports this notion, citing (1) Emily Calhoun, *Initiative Petition Reforms and the First Amendment,* 66 U.Colo.L.Rev. 129 (1995); *Norman B. Smith, supra* note 38 at 1154; Stephen A. Higginson, Note, *A Short History of the Right to Petition the Government For the Redress of Grievances,* 96 Yale L.J. 142, 156 (1986). *Id.* at 1497 n. 4. Moreover, the 11th Circuit Court of Appeals states that the court was unaware of any case that holds "state initiative regulations implicate the right to petition the government for redress of grievances."

**81.** *Biddulph, supra* note 80 at 1497.

**82.** *Michigan v. Long, supra* note 72, 463 U.S. at 1041, 103 S.Ct. at 3476.

**83.** *Supra note 1,* 355 U.S. at 45–46, 78 S.Ct. at 102.