2009 OK CIV APP 20

Patricia Bowers **EDWARDS**, Individually and Guardian of Robert Drew Bowers, an Incapacitated person, Plaintiff/Appellee,

v.

Rex **URICE**, an Individual; The Robert S. Bowers and Eloise C. Bowers Foundation, a Private Foundation; BancFirst, a National Banking Association; John C. Duty, an Individual; Michael A. Bickford, an Individual; Personal Nursing Care, Inc., an Oklahoma Corporation, Defendants/Appellants.

No. 104,594.

Court of Civil Appeals of Oklahoma, Division No. 1.

July 17, 2008.

1146

Babette Patton, Breathwit & Patton, P.C., Oklahoma City, OK, for Plaintiff/Appellee.

G. Rudy Hiersche, Jr., Hiersche Law Firm, Oklahoma City, OK, for Defendant/Appellant, Rex Urice.

Terry W. Tippens, Kevin R. Donelson, Jay P. Walters, Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Oklahoma City, OK, for Defendants/Appellants, The Robert S. Bowers and Eloise C. Bowers Foundation, and BancFirst.

CAROL M. HANSEN, Judge.

¶ 1 Defendant/Appellants, Rex Urice (Urice) and BancFirst, seek review of the trial court's judgment in favor of Plaintiff/Appellee, Patricia Bowers Edwards (Edwards), individually and as next friend of her son, Robert Drew Bowers (Drew), on Edwards' claims to set aside for undue influence amendments her mother, Eloise Cooper Bowers (Bowers), made to The Eloise Cooper Bowers 1991 Trust (Bowers 1991 Trust), and to dissolve for lack of donative intent The Robert S. Bowers and Eloise C. Bowers Foundation (Foundation). Edwards also sought to recover damages for breach of

fiduciary duty and breach of contract. We reverse as to the breach of contract claim and otherwise affirm the trial court's judgment because it is neither clearly against the weight of the evidence nor contrary to law.

¶ 2 Drew is Edwards' incapacitated adult son. He lived with his grandmother, Bowers, until her death. Edwards formerly was married to Robert Hefner III, whose daughter, Catherine Hefner (Hefner), formerly was married to Urice. Following the death of Bowers' husband in 1985, Bank of Oklahoma served as trustee for several Bowers family trusts, including the Bowers 1991 Trust.

¶ 3 In 1997, Bowers executed the Second Amended and Restated Trust Agreement of the Bowers 1991 Trust, removing Bank of Oklahoma as trustee and replacing it with BancFirst and Urice as co-trustees. The trust agreement provided no beneficiary had the power to remove Urice as trustee and only Urice had the power to remove the corporate trustee. It provided for certain distributions upon Bowers' death, including a distribution of one million dollars to Edwards conditioned upon Edwards not contesting the provisions of any Bowers trust or the appointment of Urice as Drew's guardian. It created Foundation to hold the balance of the trust fund as a nonprofit charitable foundation with Urice to be sole trustee until his death.

¶ 4 Bowers again amended the trust in 2000. The Third Amended and Restated Trust Agreement provided for the distribution to Edwards to be made in ten annual installments, conditioned upon Edwards not contesting the provisions of any Bowers trust, the establishment and funding of Foundation, the appointment of any trustee of the Foundation, or the appointment of John Duty (Duty) or any other person to serve as guardian of her son Drew.

¶ 5 Edwards brought the present suit against Appellees and Bowers on August 17, 2001. She dismissed Bowers as a party defendant after Bowers died.[1] Edwards

---

1. After Bowers' death, Edwards moved for partial summary judgment for a determination Bowers failed to effectively exercise the power of appointment granted to her in the Eloise Powers Cooper Trust Agreement (Cooper Trust), established by Bowers' mother. The Cooper Trust specified that upon Bowers' death, Edwards

would become the successor current income beneficiary unless Bowers appointed another beneficiary during her lifetime or by will upon her death. Edwards argued Bowers' execution of the Third Amended and Restated Trust Agreement of the Bowers 1991 Trust, which appointed Drew as successor beneficiary of Trust A of the

amended the petition in 2004, adding a negligence claim for injury to Drew from lack of medical care and supervision against BancFirst, John Duty, Michael Bickford, and Personal Nursing Care, Inc. as parties defendant. In compliance with a writ of mandamus from the Oklahoma Supreme Court in *Edwards v. Parrish,* Case No. MA–102350 (Sept. 12, 2005), the trial court bifurcated the equitable causes of action from the negligence claim. Edwards later dismissed Duty and Bickford and won judgment based on a jury verdict against Personal Nursing Care, Inc.

¶ 6 Edwards filed a separate action against Fellers, Snider, Blankenship, Bailey & Tippens (Fellers) on October 15, 2004, for (1) dissolution of Foundation and setting aside the amendments to the Bowers 1991 Trust, (2) breach of the terms of certain Bowers trusts requiring a corporate trustee, (3) fraud and fraudulent concealment of Drew's abuse and neglect, (4) intentional infliction of emotional distress, and (5) conspiracy to unduly influence Bowers and to alienate Edwards from Drew and Bowers. The trial court granted summary judgment to Fellers on the first and second causes of action except for damages for undue influence. It granted summary judgment to Fellers on the remaining causes of action to the extent Edwards, in her individual capacity, sought relief predating a 1999 settlement agreement regarding Drew's guardianship, pursuant to which Urice resigned as trustee of five Bowers family trusts and Edwards released all claims against Bowers, Drew, Urice, Hefner, and Duty. The trial court later granted reconsideration and modified its order to grant summary judgment to Fellers on the first and fifth causes of action except to the extent Edwards sought dissolution of Foundation and setting aside of the second and third trust amendments.

¶ 7 The trial court consolidated the two cases for trial on the equitable claims. The parties tried the matter to the court in July, September, and October, 2006. At the conclusion of trial, the trial court granted judgment in favor of Edwards, based upon extensive findings of fact and conclusions of law. It made the following rulings regarding Edwards' right to seek relief. In the 1999 settlement agreement, Edwards released any claims arising prior to October 13, 1999, but retained whatever rights she had as a contingent beneficiary under the trusts. Edwards' claim against BancFirst and Urice for breach of fiduciary duty arising from payment of co-trustee fees prior to August 17, 1999, is barred by the statute of limitations because Edwards filed suit on the claim in 2000, dismissed it in 2003, and did not refile within one year. However, Drew's claim is not barred. Neither Edwards' nor Drew's claim for undue influence is barred by the statute of limitations. Drew has standing to bring the undue influence claim by virtue of the detriments caused by change of trustee and the loss of the bargain and sale provisions pertaining to the house and furnishings. Plaintiffs' claims are not barred by the doctrine of judicial estoppel.

¶ 8 The trial court made the following conclusions of law on the merits. The Second and Third Amended and Restated Trust Agreements were procured by undue influence. Urice was receiving more than a mere trustee fee, inasmuch as he could not be removed as trustee and only he could remove the corporate trustee. Edwards could not contest his appointment as Drew's guardian. Urice was not a natural object of Bowers' affection, was a confidential advisor, and was involved in the preparation and procurement of the Second and Third Amended and Restated Trust Agreements. James Dickson (Dickson), the president of BancFirst's trust department, was a confidential advisor of Bowers and involved in the preparation and procurement of the Third Amended and Restated Trust Agreement. Bowers was elderly at the time of execution of the documents and did not receive independent and disinter-

Cooper Trust in the event Edwards contested any trust provisions or the establishment of Foundation, was neither an inter vivos transfer nor a testamentary disposition as required by the terms of the Cooper Trust.
The trial court granted the motion and directed entry of a final order. Urice and BancFirst appealed. In *Edwards v. Urice,* 2004 OK CIV APP 86, 99 P.3d 256, the Court reversed and remanded, holding Bowers effectively exercised the power of appointment by a written instrument during her lifetime.

ested advice. The Second and Third Amended and Restated Trust Agreements are invalid, and the First Amended and Restated Trust Agreement dated July 26, 1994 is declared to be the valid trust instrument of Bowers.

¶ 9 The trial court also made the following conclusions of law. Bowers did not have the donative intent required to establish a valid inter vivos gift to Foundation and did not ratify the gift. Foundation should be dissolved and the $227,668.48 in fees paid to Urice from Foundation should be reimbursed. Urice breached the terms of the 1999 settlement agreement requiring him to resign as co-trustee. Urice is liable for damages of $217,901.42, which should be reimbursed to the Bowers 1991 Trust. BancFirst breached its fiduciary duty by appointing Urice as co-trustee of certain Bowers family trusts in violation of the trust agreement and without court approval. Urice breached his fiduciary duty by accepting appointment as co-trustee in violation of the trust agreement. BancFirst and Urice are jointly and severally liable for trustee fees improperly paid to Urice, including $134,934.59 from one trust and $14,335.43 from another trust. BancFirst did not breach its fiduciary duty for payment of its trustee fees, including oil and gas fees, for investment in common trust funds, or for maintenance of Drew's home. Urice was paid $65,768.25 in co-trustee fees, of which $22,361.20 is reasonable; Urice is surcharged for the excess fee.

¶ 10 The trial court also concluded BancFirst converted funds and was unjustly enriched in the amount of $88,042.96 [2] by failing to make restitution for attorney fees it paid from Drew's guardianship account in excess of the amount allowed by the court in the guardianship proceeding. It found BancFirst should be removed as trustee for hostility to Edwards, mismanagement, and conversion. It found Edwards was not entitled to an award of punitive damages. The trial court found there was no just reason for delay and directed that its findings and fact and conclusions of law be entered as a final judgment.

¶ 11 BancFirst and Foundation appealed the judgment in Case No. 104,594, while Urice appealed it in Case No. 104,604 and Fellers appealed it in Case No. 104,596. The Oklahoma Supreme Court consolidated Case Nos. 104,594 and 104604 in surviving Case No. 104,594, and designated Case No. 104,596 as a companion case. Although Foundation was named as an appellant, it filed no briefs. Therefore, we will treat its appeal as abandoned.

¶ 12 After this case was fully briefed and assigned to the Court of Civil Appeals, Edwards, the Appellee, filed a "Supplemental Petition in Error" seeking review of a post-judgment order of the trial court declining to exercise jurisdiction over Edwards' motion seeking to require BancFirst to reimburse the Bowers trusts for attorney fees BancFirst paid from the Bowers trusts to Fellers to represent it in this matter. Pursuant to 12 O.S.2001, Ch. 15, App. 1, Okla.Sup. Ct.R. 1.26(c)(3) and (4), a supplemental petition in error may be filed to cure a premature petition if the Court has not yet dismissed the premature petition. Edwards' Supplemental Petition in Error was not filed in compliance with Okla.Sup.Ct.R. 1.26 and is out of time to be treated as a counter-appeal pursuant to Okla.Sup.Ct.R. 1.27(a). Therefore, it is stricken.

¶ 13 In reviewing an equitable matter, we will not disturb the trial court's judgment unless it is against the clear weight of the evidence or contrary to law or established principles of equity. *Wetsel v. Johnson,* 1970 OK 69, 468 P.2d 479, 481.

# I

■ ¶ 14 Both BancFirst and Urice contend the trial court improperly applied the law of undue influence as set forth in *In Re Estate of Maheras (Maheras),* 1995 OK 40, 897 P.2d 268, and *In Re Estate of Holcomb (Holcomb),* 2002 OK 90, 63 P.3d 9. They argue the trial court erred in applying the *Maheras* factors for a presumption of undue influence after finding the presumption had been rebutted. They also argue the trial

---

**2.** The trial court's order states the amount is "$88,42.96." However, the findings of fact state BancFirst paid the law firm $117,042.96, of which $29,000.00 was allowed by the court, leaving a balance of $88,042.96.

court erred in failing to identify the person responsible for undue influence and in aggregating the acts of all co-defendants.

¶ 15 In *Maheras,* the Court affirmed the trial court's finding of undue influence. It set forth a two-prong test to determine whether undue influence taints the procurement or preparation of a will: (1) whether there was a confidential relationship, and (2) whether the stronger party in the relationship assisted in the preparation or procurement of the weaker person's testamentary instrument. *Maheras,* 897 P.2d at 272. The Court listed the following factors to be considered in applying the two-prong test:

1. Whether the person charged with undue influence was not a natural object of the maker's bounty;

2. Whether the stronger person was a trusted or confidential advisor or agent of the will's maker;

3. Whether he/she was present and/or active in the procurement or preparation of the will;

4. Whether the will's maker was of advanced age or impaired faculties;

5. Whether independent and disinterested advice regarding the testamentary disposition was given to its maker.

*Id.* at 272–273 (footnotes omitted). When the trial court finds the two prong test is satisfied, a rebuttable presumption of undue influence arises. It may be rebutted by showing either the confidential relationship had been severed before the critical events in controversy or the will's maker actually received independent and competent advice about the disposition of his/her estate. *Id.* at 273.

■ ¶ 16 In *Holcomb,* the Court affirmed the trial court's finding the decedent's will was not the product of undue influence. Applying the directive of 12 O.S.2001 § 2303 [3]

as to the effect of presumptions in civil cases, the Court stated, "Because the basic facts of the presumption of undue influence are not probative of the ultimate fact of undue influence, the presumption falls into the second category of the statute, shifting only the burden of producing evidence." *Holcomb,* 63 P.3d at 16, n. 17. When the will contestant establishes the basic facts of the presumption, i.e., a confidential relationship in which the stronger party participates in the procurement or preparation of the will of the weaker party, the will proponent has the burden of producing evidence from which the trial court could find the nonexistence of undue influence. *Id.* at 16–17, 19. If the will proponent meets this burden, the will contestant is restored to the burden of proving undue influence by a preponderance of the evidence.

■ ¶ 17 *Holcomb* does not overrule the *Maheras* factors as appropriate considerations in determining the existence of undue influence. The *Maheras* factors are probative on the ultimate fact of undue influence, and were considered by the *Holcomb* Court in ruling the trial court's order was not clearly against the weight of the evidence.

■ ¶ 18 The two factors set forth in *Maheras* as admissible evidence to rebut the presumption, termination of the confidential relationship prior to the will's execution, or receipt by the will maker of independent advice, are sufficient but not exclusive. *Holcomb,* 63 P.3d at 19–20. Advice is independent if the advisor (1) provides the will maker with a full and private consultation regarding disposition of her estate, (2) is competent to inform the will maker about the legal effect of her dispositive intentions, and (3) is sufficiently dissociated from the interest of the stronger party in the confi-

---

3. 12 O.S.2001 § 2303 provides,
Except when otherwise provided by law, when the basic fact of a presumption has been established as provided in Section 302 of this Code:
1. If the basic fact has any probative value of the existence of the presumed fact, the presumed fact shall be assumed to exist and the burden of persuading the trier of fact of the nonexistence of the presumed fact rests on the party against whom the presumption operates; or

2. If the basic fact does not have any probative value of the existence of the presumed fact, the presumed fact is disregarded when the party against whom the presumption operates introduces evidence which would support a finding of the nonexistence of the presumed fact and the existence of the fact otherwise presumed is then determined from the evidence in the same manner as if no presumption had been operable in the case.

dential relationship that the advisor can give impartial and confidential advice. *Id.* at 20. In *Holcomb,* the Court found the two *Maheras* rebutting factors absent, but found evidence that the will proponent's influence arose out of acts of kindness in caring for the will maker daily for five years and that the will maker alone provided the dispositive terms of the will was sufficient to rebut the presumption. *Id.* at 20–21.

¶ 19 The trial court's order states its finding on the ultimate fact: "Bowers was unduly influenced." It supported its conclusion with findings as to the *Maheras* factors. It did not apply the presumption but required Edwards to prove undue influence by a preponderance of the evidence. Although the trial court did not expressly state a particular person unduly influenced Bowers, its findings as to the *Maheras* factors were based on Urice's and Dickson's actions and relationship with Bowers. Therefore, the only fair reading of the order is the trial court found Urice and Dickson unduly influenced Bowers. We find no error of law in the trial court's application of the law of undue influence.

 ¶ 20 The trial court did not need to find Urice and Dickson acted in conspiracy to unduly influence Bowers. A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means. Civil conspiracy itself does not create liability, but enlarges the pool of potential defendants from whom a plaintiff may recover. *Brock v. Thompson,* 1997 OK 127, 948 P.2d 279, 297 and n. 66. When the plaintiff's claim relies "upon acts of several defendants, no one of whom, standing alone, would be liable, and from which the harmful effects complained of could result only through collective action ... proof of conspiracy must be made, in order to support the action at all." *Cales v. Rushing,* 1958 OK 12, 321 P.2d 404, 409. In an undue influence case, the liability of the defendants for damages is not at issue. Rather, the question is whether the testamentary disposition "is the product of an influence brought to bear against the maker in any manner which overcomes his/her free agency." *Maheras,* 897 P.2d at 273. The harmful effect of undue influence could result from the acts of either defendant standing alone or in combination. Either way, the

focus is upon the effect of their acts on Bowers, not on whether they acted in concert.

## II

 ¶ 21 Urice contends there was insufficient evidence of undue influence. In reviewing the fact findings of a trial court acting in equity, we must indulge in the presumption they are correct, and we will not set aside the fact findings unless they are against the clear weight of the evidence. *Roller v. Pan Mut. Royalties,* 1952 OK 373, 207 Okla. 649, 251 P.2d 1053, 1058.

¶ 22 The evidence in the record establishes the following facts. Urice was not related to Bowers by blood and was not a natural object of her bounty. Prior to 1997, Bowers had never mentioned Urice in her estate planning or wanted him to be involved in her financial affairs. In 1997, Bowers called Hefner for help with some documents, and Hefner sent Urice, then her husband, to answer Bowers' questions. This was the first time Urice became aware of the extent of Bowers' estate. Urice and David Rainbolt (Rainbolt), the chief executive officer of BancFirst, were fraternity brothers, college roommates, and close personal friends. Urice talked to Rainbolt about transferring the trusts to BancFirst and set up a meeting between Urice, Rainbolt, and Bowers. Following the meeting, Urice told Rainbolt that Bowers wanted BancFirst to be the trustee of the Bowers trusts. Urice was in a confidential relationship with Bowers and BancFirst representatives were advisors of Bowers.

¶ 23 The record establishes Urice and Rainbolt contacted and had meetings and telephone conferences with Terry Tippens or Paul Dudman (Dudman) of the Fellers law firm, and Dudman drafted numerous documents, letters, and trust instruments for Bowers' signature based upon information, instructions, and feedback he received from Urice or Rainbolt, not Bowers. Urice was active in the preparation and procurement of the Second Amended and Restated Trust Agreement, and benefitted from every revision. The agreement established Foundation on Bowers' death, making Urice the sole initial trustee. It provided no beneficiary

would have the right to remove him as co-trustee, and left Edwards one million dollars provided she did not contest the appointment of Urice as guardian for her son or the establishment of Foundation or any other Bowers trusts. It removed the bargain and sale of the residence for Drew, and contained a power of appointment in favor of Drew if Edwards contested the provisions in any Bowers trust or the appointment of Urice as guardian for Drew.

¶ 24 The record establishes Dudman had contacts with Urice and Dickson regarding the formation of Foundation and the Third Amended and Restated Trust Agreement. Dickson recommended the one million dollar bequest to Edwards be paid in annual installments of $100,000.00, which had the effect of leaving the undistributed funds in BancFirst where they would continue to generate fees to BancFirst.

¶ 25 There is evidence in the record from which the trial court could find Bowers was of advanced age and had impaired faculties. Bowers was 84 years old in 1997. In 1998, she had a stroke, left the hospital against medical advice, and did not receive recommended rehabilitative care. According to Bowers' nurse, Bowers did not understand that she was paying Urice any compensation. The nurse testified Drew asked Urice how much he was being paid, and Urice said "a handshake and a smile." Duty, who formerly worked in the trust department at BancFirst but left to become Drew's guardian, believed Bowers did not understand her estate plan, the function and design of Foundation, or the guardianship arrangement.

¶ 26 The record contains the following evidence showing Bowers did not receive independent and disinterested advice. Urice testified Fellers represented him in the summer of 1997. According to Dudman, Fellers represented BancFirst in connection with reviewing the trust instruments to change the trustees. Dudman did not disclose his relationship with Urice or BancFirst to Bowers, did not obtain any written consents or waivers from any client, and never suggested to Bowers that she retain independent counsel. He discussed BancFirst's and Urice's fees with BancFirst personnel, but did not negotiate those fees on Bowers' behalf. Dudman said Bowers initially told him she wanted Edwards taken out of her trust, but Dudman then drafted a document contrary to those wishes and sent the draft to Urice but not Bowers. Dudman had three private meetings with Bowers but did not meet with her regarding Foundation or the Third Amended and Restated Trust Agreement. He discussed Urice's compensation package with Urice and Dickson, but not Bowers. Dudman agreed every change in Bowers' estate plan from 1997 through 2000 benefitted Urice. Bowers signed every document Dudman presented to her with no changes whatsoever.

¶ 27 The trial court's finding of undue influence is supported overwhelmingly by this record. The finding is not clearly against the weight of the evidence.

### III

¶ 28 Both Urice and BancFirst contend the trial court erred in finding there was no intervivos gift to Foundation. They argue there is a complete lack of evidence Bowers did not know what was transpiring with respect to Foundation.

¶ 29 To constitute a valid intervivos gift there must be (1) donative intent of the donor, (2) actual delivery of the subject matter of the gift, and (3) the donor's relinquishment of all ownership and dominion over subject-matter of gift. After the death of the alleged donor, in order to establish an intervivos gift, the evidence must be clear, explicit, and convincing in support of every element necessary to constitute a gift. *In Re Estate of Stinchcomb*, 1983 OK 120, 674 P.2d 26, 30.

¶ 30 The record contains evidence Bowers did not intend to give her money to charity, and did not understand that Foundation was a charity. Bowers' former private duty nurse testified she heard conversations between Urice and Bowers about Foundation. She said when Urice mentioned a charity, Bowers said, "I'm not giving my money to any damn poor people, and I don't want Drew to run out of money." The nurse said Urice then told Bowers that Foundation was a tax shelter to protect Drew's money.

¶ 31 The record contains evidence Bowers attended and participated in Foundation meetings only when they were held at her home, and that the meetings were pre-scripted and the minutes were prepared in advance. The record lacks evidence Dudman gave Bowers any legal advice about creating Foundation. Dudman's billing records showed he had numerous meetings and conversations with Urice or Dickson, but not Bowers, regarding Foundation prior to preparing its certificate of incorporation, and met with Urice and Bowers to obtain Bowers' signature on the certificate of incorporation without any prior communication with her about Foundation. After Dudman discussed funding Foundation with Urice, Dickson, and Bowers' accountant, but not Bowers, he prepared a letter for Bowers' signature irrevocably giving $4.5 million to Foundation. Dudman discussed Urice's compensation as chief executive officer of Foundation with Urice and Dickson, but not Bowers.

¶ 32 Based on this record, we cannot say the trial court's finding Bower lacked donative intent is clearly against the weight of the evidence.

### IV

¶ 33 BancFirst and Urice contend the law of the case prohibits the district court from invalidating the Second Amended and Restated Trust agreement. Although the pretrial conference order listed issue preclusion and claim preclusion of *Edwards v. Urice*, 2004 OK CIV APP 86, 99 P.3d 256, as one of the grounds of defense, BancFirst does not cite to the record showing it presented that defense at trial. We will not review questions not presented to and passed upon by the trial court. *Von Stilli v. Young*, 1950 OK 137, 203 Okla. 86, 219 P.2d 224, 228.

### V

¶ 34 BancFirst and Urice contend the trial court erred in finding a breach of fiduciary duty for payment of co-trustee fees to Urice. They argue Bowers, in her roles as income beneficiary of certain trusts and as Drew's guardian, could direct the payment of co-trustee fees. They do not, however, cite to any evidence showing Bowers directed payment of fees to Urice. They cite to a page of Bowers' deposition as showing Bow-

ers was aware Urice was being paid those fees, but Bowers' deposition testimony does not support that assertion.

¶ 35 BancFirst and Urice also argue the claim for breach of fiduciary duty for payment of co-trustee fees from Drew's trusts is barred by res judicata because the guardianship reports were approved by the guardianship court. The guardianship report they cite as supporting evidence neither reflects payment of co-trustee fees nor requests court approval for their payment. BancFirst and Urice have failed to show the claim for breach of fiduciary duty for payment of co-trustees to Urice was previously litigated.

### VI

¶ 36 Urice contends Edwards' claim for undue influence is barred by the two year limitation period of 12 O.S.Supp.2005 § 95(A)(3) for "an action for injury to the rights of another, not arising on contract, and not hereinafter enumerated." The statute of limitations for undue influence is five years under § 95(A)(12). *Burkes v. Estate of Burkes*, 1997 OK 76, 945 P.2d 481, 484. Bowers executed the Second Amended and Restated Trust Agreement, the earliest instrument at issue, on November 26, 1997. Edwards brought her action within five years of this date. Therefore, her claim for undue influence is not time-barred.

### VII

¶ 37 Urice and BancFirst contend Edwards released all claims arising prior to October 1999 in the agreement she signed to settle the dispute regarding Drew's guardianship. They argue the release bars Edwards from proceeding on her claim of undue influence arising from Bowers' execution of the Second Amended and Restated Trust Agreement on November 26, 1997. The settlement agreement provides, "Nothing herein shall be construed to create any rights or defeat any claims or contentions either party may have with regard to trusts in which Edwards has any interest, present or future." This language excludes from the release Edwards' claim against Urice for undue

influence in procuring the Second Amended and Restated Trust Agreement.

## VIII

■■■ ¶ 38 Urice challenges the trial court's finding he breached the settlement agreement by contending (1) the breach of contract claim was precluded by 12 O.S.2001 § 100 because Edward asserted it in her prior lawsuit and did not refile the action within a year, and (2) as a matter of law, the settlement agreement did not prohibit him from continuing in his role with the Bowers 1991 Trust. In response, Edwards argues she brought the breach of contract claim in her capacity as Drew's guardian and not in her individual capacity. She argues Urice violated his agreement to resign as trustee of the Bowers' trusts by entering an agreement to serve as Bowers' financial advisor and be paid from the Bowers 1991 Trust.

¶ 39 The settlement agreement provided in relevant part,

WHEREAS, Edwards objects to the appointment of [Urice] as co-trustee with [BancFirst] of certain Bowers family trusts established for the benefit of Bowers and/or Drew and contingently Edwards; and

WHEREAS, Edwards has agreed to withdraw her objections to Duty serving as co-guardian with Bowers in consideration for Urice resigning as co-trustee of the various Bowers family trusts, . . .

. . .

4. *Urice Resigns.* As partial consideration for agreements made herein by Edwards, Urice agrees to resign as co-trustee of the following Bowers family trusts: Robert S. Bowers Family Trust, Robert S. Bowers Residuary Trust, Robert Drew Bowers 1973 Trust, Robert Drew Bowers 1995 Trust and Eloise Powers Cooper Trust, and Bowers agrees not to reappoint Urice as co-trustee to those trusts. However, Urice may continue to serve as a director of Great Plains Bottling Company.

¶ 40 The settlement agreement must be considered as a whole so as to give effect to all its provisions. Because it is unambiguous, we must interpret it as a matter of law, giving effect to the mutual intent of the parties at the time of contracting. *Pitco*

*Production Co. v. Chaparral Energy, Inc.,* 2003 OK 5, 63 P.3d 541, 545–546. Although the "whereas" clauses in the settlement agreement refer generally to the Bowers family trusts, the clause stating Urice's obligation referred to specific trusts. Reading the agreement as a whole, we cannot construe it to prohibit Urice from serving as trustee or advisor to a trust not mentioned in the specific listing. Therefore, as a matter of law, Urice's serving as financial advisor to the Bowers 1991 Trust and being paid from that trust is not a breach of the settlement agreement. To the extent the trial court's judgment so held, it must be reversed. Because we reverse based on our construction of the settlement agreement, we need not determine whether the cause of action was barred by 12 O.S.2001 § 100.

## IX

¶ 41 BancFirst's last contention is the trial court erred in finding BancFirst converted funds or was unjustly enriched. It argues (1) the guardian's approval of the fees preclude any claim for unjust enrichment or conversion, (2) as trustee, it was permitted to hire attorneys and accountants, (3) the elements of conversion are not present, and (4) it was not unjustly enriched because it paid out attorney fees to protect its beneficiary and did not receive benefit.

¶ 42 The evidence at trial showed Fellers represented BancFirst in Drew's guardianship proceeding. BancFirst paid Fellers $117,042.96 for that representation from Drew's guardianship investment management account. Duty, then the guardian, reported the payment in his accounting submitted to the court in the guardianship proceeding. The court allowed only $29,000.00 of the attorney fee to Fellers as beneficial to Drew. Dickson testified BancFirst reimbursed the guardianship investment management account for the disallowed portion of the attorney fee by charging half of it to Foundation, one fourth to the Robert Drew Bowers 1973 Trust, and one fourth to the Robert Drew Bowers 1982 Trust.

■■■ ¶ 43 We agree the record presents no evidence supporting a conversion

claim. *See Welty v. Martinaire of Okla., Inc.,* 1994 OK 10, 867 P.2d 1273, 1275 ("The general rule in Oklahoma is that only tangible personal property may be converted."). However, the doctrine of unjust enrichment provides for recovery upon a showing the defendant has money in its hands that, in equity and good conscience, it ought not be allowed to retain. *French Energy, Inc. v. Alexander,* 1991 OK 106, 818 P.2d 1234, 1237. BancFirst did not attempt to show Foundation had any interest in the guardianship proceeding requiring it to bear half the excess attorney fee, and the guardianship court's order is determinative of the amount of the fee that benefitted Drew. To the extent BancFirst used the Foundation and Drew's trust accounts to reimburse the guardianship account for the excess fee, it was unjustly enriched. The trial court's ruling is neither clearly against the weight of the evidence nor contrary to law.

¶ 44 For the foregoing reasons, the trial court's judgment is REVERSED to the extent it awarded damages against Urice in the amount of $217,901.42 for breach of contract and is otherwise AFFIRMED.

BELL, J. (sitting by designation), concurs.

JOPLIN, J., dissents with opinion.

LARRY JOPLIN, Judge, concurring in part, and dissenting in part.

¶ 1 I concur with this Court's conclusion to reverse the trial court's judgment awarding damages against Defendant Rex Urice for breach of contract. In all other respects, however, I respectfully dissent.

¶ 2 Starting in 2001, Plaintiff Edwards sued her mother, her mother's financial advisor, her mother's estate planning attorney, and the trustees of the family trust, both individual and corporate. In essence, she alleged that, beginning in 1997, Defendants had unduely influenced her mother to disinherit her by creating a charitable foundation. If not for undue influence, how else could one account for her mother's actions?

¶ 3 Twelve years *before* any of the Defendants (except mother) had ever made an appearance in this not uncommon, but always sad, family tragedy, Plaintiff wrote to her mother:

Since my father's death and probate, I have deliberately left it to you to make whatever decisions you must make in regard to the family trust. . . . It is obvious that you feel no need to speak with me further about the trust or the future, and it is equally obvious that you have no plans to share your holdings with me in any way. I would have joined you had you chosen to break the trust, but your actions make it clear that you plan to leave it as it stands. Since I was totally excluded (actually disinherited 23 years ago for reasons I am sure I will never know), I feel that I have buried a father who felt nothing but anger and hate for me, and that now you obviously share his feelings.

This letter was written in 1985 after the death of Plaintiff's father, and after Plaintiff discovered *her father's estate plan,* by which, according to her, she had been "disinherited." It was also in 1985 that Plaintiff *first* attempted to "break" the trust.

¶ 4 All of the early estate planning in this unfortunate family saga was performed by different attorneys, different accountants and different corporate trustees from any of the Defendants in this case. Almost a decade after her husband's death, Plaintiff's mother amended one of the existing trusts, created an additional one to provide for Drew, and left the residue to charity. This occurred in 1994, fully three years *before* any of the Defendants were involved.

¶ 5 In 1997, Plaintiff's mother again amended her estate plan, and refined her charitable giving by creating her own family charitable foundation, the Defendant Robert S. Bowers and Eloise C. Bowers Foundation. This time, she used a different financial advisor, different corporate trustee, and different attorney, with whom she met or spoke privately for more than four hours prior to execution of the trust documents. Yet, it is *these* advisors, trustees and attorneys that Plaintiff sued (along with her mother) four years later, alleging *these* estate plans could only exist because her mother's will had been overcome, and the Defendants' will substituted for mother's.

¶ 6 While Plaintiff's lawsuit asserted other claims, the principal allegations centered on

Plaintiff's belief that the Defendants had conspired together to unduly influence her mother. Proving the conspiracy was essential to her right to recover. Otherwise, the inescapable fact that her mother had many separate and individual conversations and contacts with all the other Defendants, at different times and different places, would make it impossible to prove that her duly attested and executed legal documents did not actually reflect her true desires.

¶ 7 It should be noted that, throughout the entire history of the Bowers family estate plans, beginning with Robert Bowers in the early 1980's and continuing until this suit was filed, grandson Drew was always well-provided for, but Plaintiff, not so much. This was true regardless of who were the attorneys, financial advisors or corporate trustees. The only constant in all the Bowers' estate planning was mother, father, daughter and their relationship.

¶ 8 After the hearing on the merits, the trial court correctly found that no conspiracy existed. Equally significant, the trial court also found that, while the presumption of undue influence had arisen on application of the *Maheras* factors, Defendants had successfully overcome the presumption.

¶ 9 Yet, when the trial court issued its final order, it found that mother's testamentary dispositions were, in fact, not the product of her will, but that someone else had substituted their will for hers. Incredibly, however, the trial court completely failed to identify whose will was substituted. This led the majority of this Court to speculate that, by a "fair reading" of the order, it must have been Urice, the financial advisor, and James Dickson, president of the Bank's trust department.

¶ 10 The failure of the trial court to identify the culprit is alone sufficient, in my mind, to warrant reversal. However, I believe the trial court also committed several other errors which this Court nevertheless affirms. Rather than addressing the substantive appellate claims of issue preclusion, statute of limitations, and the effect of one or more

releases of claim by Plaintiff, a discussion of the most obvious errors will suffice to make the point.

¶ 11 Because Rex Urice, a related family member, attorney and former trust officer at a local bank, had a confidential relationship with mother and introduced her to the BancFirst officers and a probate attorney, a presumption of undue influence arose, and the burden of proof shifted. At the conclusion of trial, however, the court ruled the presumption had been overcome.

¶ 12 How does a party overcome such a presumption? "The person who desires to overcome this presumption must then go forward to produce evidence showing either that (a) the confidential relationship had been severed *before* the critical events in controversy or (b) the will's maker actually received *independent and competent advice* about the disposition of his/her estate." *In the Matter of the Estate of Maheras,* 1995 OK 40, ¶ 9, 897 P.2d 268, 273. (Emphasis original.) (Footnotes omitted.)

¶ 13 Because the first never occurred, one need only be reminded that the evidence unequivocally showed mother met or spoke with her attorney privately for more than four hours before executing the Second Amended Trust documents. The attorney documented ninety-six (96) contacts with mother regarding her estate plans during the period he advised her.

¶ 14 That said, there are only two conclusions to be drawn: mother either received independent and competent legal advice, or she didn't. Because the court found that she had, it was error for the trial court to return to the original *Maheras* factors to conclude that undue influence existed.

¶ 15 With the presumption overcome, Plaintiff was required to prove her case of undue influence by a preponderance of the evidence. *In the Matter of the Estate of Holcomb,* 2002 OK 90, ¶ 42, 63 P.3d 9, 22.[1] Once the trial court sustained Defendants' demurrer to Plaintiff's claim of conspiracy, this burden was impossible to meet.

---

1. "The will proponent's successful rebuttal of the presumption restores the case to the procedural posture it would have had if the presumption had never been operative. This means that contes-

tants must prove the existence of undue influence by a preponderance of the evidence without the aide of the presumption."

¶ 16 None of the acts of any single Defendant were sufficient to prove undue influence, in my mind, explaining the trial court's failure to identify the someone whose will was substituted for mother's. More importantly, absent a conspiracy, none of the acts of any of the Defendants could be attributed to any other Defendant. Thus, the trial court's order was against the clear weight of evidence and should be reversed.

¶ 17 Furthermore, in weighing the evidence, the trial court repeatedly and erroneously focused on possible inferences and ignored the obvious. For instance, the trial court found that mother did not have the donative intent required to establish a valid inter vivos gift to her recently created charitable foundation. The evidence cited by the trial court in support of that conclusion—and cited by the majority of this Court in support of affirmance—consisted primarily of a conversation overheard by a private duty nurse, who said she heard mother say to Urice, "I'm not giving my money to any damn poor people."

¶ 18 The most sinister inference to be drawn from this evidence is that mother either did not know she had created a charitable foundation, or did not want one. On the other hand, most of the evidence presented on this point showed that the foundation was created and funded only after numerous meetings between mother, her attorney, her financial advisor and the corporate trustee. After the Foundation was created, mother attended many meetings of the Foundation's Board of Directors; indeed, one defense exhibit (DX41) is a picture of a smiling Eloise Bowers present at a Board meeting with nine other people.

¶ 19 Yet, in weighing this evidence of mother's knowledge of and participation in the family charitable foundation, the trial court found it significant (and on which finding the majority of this Court relies in affirming) that "Bowers attended and participated in the Foundation meetings only when they were held in her home." *Only?* It's hard to imagine better or more conclusive evidence of her donative intent to create a charitable foundation than her willingness to participate in Board of Directors' meetings, even if she attended only the meetings at her home.

¶ 20 One other example of the trial court's focus and over-emphasis on possible inferences, while ignoring the obvious reality, involves part of what the majority of this Court calls "overwhelming" evidence. The trial court found it significant that mother signed every document presented to her by her attorney *with no changes whatsoever.* The inference, I suppose, is that the documents represented someone else's will. This ignores that fact that the documents presented to her for her signature were properly prepared, attested to and duly executed.

¶ 21 One final point: By holding that a trustee, authorized by trust instruments to hire attorneys "as the trustee may deem advisable" has been unjustly enriched by being reimbursed from the trust for *attorneys fees expended,* turns, let me suggest, trust law on its head.

¶ 22 Suffice it to say, I would reverse the trial court's order in its entirety.